Garsh, J.
John Squires (“Squires”) was indicted for trafficking in cocaine over fourteen grams, possession of marijuana with intent to distribute, and trafficking in a controlled substance within one hundred feet of a public park or playground. He moves to suppress two pieces of physical evidence seized from his home, namely a packet of cocaine and a package label, on the grounds that the police had no unequivocal or voluntarily given consent to search and that, if a third party did so consent, such individual lacked authority to do so.[1] An evidentiary hearing was held. For the reasons set forth below, the defendant’s motion is denied.
FINDINGS OF FACT
Based on all the credible evidence and reasonable inferences drawn from that evidence, the court finds the following facts:
On October 18, 1998, between 8:30 and 9:00 o’clock in the morning, United States Post Inspector Michael McCarran (“McCarran”) advised Trooper Mark Marrón (“Marrón”) of the Massachusetts State Police that he wished to have a narcotics dog sniff an Express Mail package. McCarran investigates drugs sent through the mails; he has specialized training in narcotics and mailings. Marrón has had specialized training in narcotics and has participated in numerous narcotics investigations.
As part of McCarran’s duties, he profiles express mail labels retained by the post office after packages have been delivered. In the spring of 1998, McCarran became suspicious about several packages that had been mailed from Tucson to Malden, Clinton, Nor-wood, and Cambridge, Massachusetts. These packages were apparently signed for by a Melissa Tellier and a John Squires. All the labels bore the same handwriting; Tucson is a known drug source; all the packages weighed between ten and twenty pounds; the majority had the same return address. McCarran forwarded copies of the express mail labels to a postal inspector in Tucson, and, on October 27, 1998, the inspector notified him that he had in his possession a package addressed to John Tellier at 5 Baldwin Avenue in Everett with the same return address as had appeared on some of the other labels. McCarran picked a bulky package up at the airport the next morning. It was suspicious because all the seams were sealed with brown tape. Taping a package in this way is consistent with an attempt by a drug trafficker to make it difficult for a trained canine to detect drugs inside.
*148 Marrón arranged to have a narcotics canine at the airport. The dog scratched at the package that had been retrieved by McCarran (the “Package”), which had been placed among hundreds of other packages. The Package was not tampered with to make it easier for the dog to detect contraband. The dog’s response indicated a positive response for drugs.
Following a meeting at the Everett police station at approximately 11:00 AM with McCarran, Marrón, and Everett officers, Marrón initiated surveillance of the Baldwin Avenue address while McCarran, dressed as a mailperson and driving a postal delivery truck, made a controlled delivery at 11:55 AM. McCarran knocked on the front door and the defendant came to the door. McCarran said that he had a package for John Tellier. The defendant asked if was from New York. When McCarran said it was from Tucson, Squires said that it was a present for his baby from his Uncle Freddy.[2] When asked to sign the mailing label acknowledging receipt, the defendant did so, using the name John Squires. Once Squires signed the label, McCarran asked if he could use the bathroom. After consulting with Melissa Tellier (‘Tellier”), Squires agreed and McCarran entered the residence where he detected a strong odor of marijuana.
After McCarran left the residence, the location remained under surveillance. No one arrived or left 5 Baldwin Avenue. An hour later, Marrón, McCarran, and two officers from the Everett Police Department went to the house. All had visible badges identifying themselves as officers. No weapons were drawn. After McCarran knocked at the door and said that he was the mailman, Squires opened it. Matron then verbally identified himself as a Massachusetts State Police Officer and informed Squires that a drug sniffing dog had alerted to the Package he had signed for. Squires responded that the Package was not his and that he would return it to the post office. Marrón asked if they could come into the house and discuss the matter further and Squires agreed. None of the officers represented that they had a search warrant or flashed papers that appeared to be a search warrant.
All four officers entered the house. One officer, who was carrying a battering ram, immediately placed it in the hallway comer. The officers conducted a protective sweep, entering each room in the apartment to determine if anyone other than Tellier and her infant was present. The rooms were not otherwise searched.
Marrón and McCarran spoke with Squires in the kitchen. Tellier was present in the residence. She is the defendant’s flaneé. Squires is the father of her son, Sean Thomas Squires, who was one month old on October 28, 1998. Tellier did not sign the lease for the premises at 5 Baldwin Avenue nor did she pay rent. She had lived in the apartment, however, with Squires for several months prior to the arrival of the police. Her clothes were there as well as the baby’s belongings. She thought of the apartment as her residence, albeit one she shared with Squires, as is reflected in her testimony in which she referred to the apartment as “my apartment,” to the one bedroom there as “my bedroom,” to the food in the kitchen cabinet where drugs were ultimately located as “my food,” and to the candy in a candy dish on the counter in the kitchen as “my candy.” I infer that she conveyed the same impression to the officers. Tellier received mail at 5 Baldwin Avenue, a fact known to the police before the officers entered the residence. Tellier stopped working in February of 1998 and was dependent upon the defendant for financial support. Tellier and Squires had the mutual use of and access to the kitchen. Tellier had a non-exclusive right of access to and control over the premises in which she resided, including, but not limited to, the kitchen and its cabinets. She had authority to permit third parties to open the cabinets. A person of reasonable caution would believe that Tellier had authority to permit the police to search the residence.
The residence which Tellier shared with Squires has a hallway leading into the living room, a nursery to the left of the living room, a kitchen to the right of the living room, a bathroom off the kitchen and a small bedroom to the right of the kitchen. Between the kitchen and living room is a doorway without a door.
Tellier was very upset at the sudden appearance of the police in the living room where she was sitting and the fleeting sight of the battering ram, which was not used to gain entrance.[3] She quieted down after being advised by Marrón that the police were conducting a narcotics investigation involving multiple deliveries of packages, some of which it was believed she had signed for. Tellier was shown mailing labels addressed to Melissa Tellier in Norwood, one of which was signed by someone purporting to be Melissa Tellier and the other by someone purporting to be M. Tellier. During her conversation with Matron, she told him that she had just had a baby and that she had been living at that residence for four to five months.
Shortly after the officers arrived, Tellier asked to go into her bedroom to nurse in private. She was denied access with one of the officers commenting that it would better if she stayed in the parlor because they did not know what was in the house. Denying access to the bedroom was a reasonable safely measure. Tellier nursed the infant on the couch in the living room for approximately one minute, after which he fell asleep. The presence of an officer in that room made her uncomfortable.[4]
Marrón orally advised Squires of his Miranda rights in the kitchen[5] and also gave him a sheet to read containing the Miranda warnings. Squires acknowledged understanding his rights and signed the Miranda form. They proceeded to speak about the Package. Tellier was walking back and forth in the kitchen area. After Squires repeated that the Package was not his and that he intended to return it, McC- *149 arran reminded him of what he had said when he signed for the Package, namely that it was a present for his baby from Uncle Freddy. At that point, Squires became more cooperative and consented to the police opening the package, signing a consent to search form that acknowledged that he did so “voluntarily, without threats or promises of any kind.” In the space for specification of “premises, property, car and/or person,” the words “one express mail package” were inserted prior to the execution of the consent form. The form authorizes the police to conduct a search of that property without a search warrant “and to take possession of any material which is connected in any way with the investigation they are making.” Squires advised that the Package could be found in the nursery underneath the crib. One of the police officers retrieved it and opened it in the kitchen. Inside was a ten to twelve pound block of a compressed herbal substance wrapped in contact paper consistent with the contents being marijuana.
McCarran noticed that the mailing label had been detached from the Package and asked where it was. Squires said that he had thrown it in the trash because the individuals who were sending him the packages had told him to rip off the labels and discard them and never to open the packages themselves. McCarran then located the Express Mail label in the kitchen trash receptacle. He removed it. Part of the label was visible by looking into the uncovered trash container. McCarran removed the label before anyone had consented to a search of the apartment.
One of the officers helped himself to candy in a dish on the kitchen counter. However, neither that officer nor any of the other officers opened kitchen cabinets looking for candy.
Squires told the police that he was paid two to four hundred dollars each time he signed for packages and that he had signed for packages three or four times before in the few months he had been living at that location. He said that he did so at Jim’s request, but that he did not know Jim’s last name or how to contact him. He admitted that he knew marijuana was in the packages. With respect to the package that had just been opened, Squires said that he had received a call the night before from a person who identified himself only as a friend of Dave’s. Squires stated that he did not knowhow to contact Dave. This individual, according to Squires, asked him to sign for a package sent to his address and Squires stated that he agreed to do so. Squires stated that he expected someone shortly would be arriving in a red Pontiac Firebird to pick up the Package.
Squires said that other than a few roaches in an ashtray, there was no marijuana in his house and no items used for distribution. However, he repeatedly refused to consent to a search of the residence. As the officers spoke with Squires, Tellier was walking in between the kitchen and living room area or sitting in the living room with the baby. She often was weeping. At one point, she urged Squires to be fully cooperative. She said words to the effect, ‘Tell them everything you know; this has got to end. We have nothing to hide in the apartment.”
Shortly after Squires refused to consent to a search of the apartment, Marrón left Squires in the kitchen with McCarran and spoke with Tellier. They spoke in or adjacent to the nursery. Squires could not hear what was being said. Using a conversational tone, Marrón asked Tellier for permission to search the residence for items relating to the distribution of marijuana. He informed her that she could require the police to get a search warrant. Tellier responded that there was nothing to hide and authorized the police to conduct a search.[6] Marrón did not secure the consent in writing. Marrón did not threaten Tellier with arrest if she did not consent to a search. Nor did he indicate that the Department of Social Services would be called and take her child if she did not cooperate. Matron did not ask Tellier if she had been smoking marijuana or taking any other drugs. There is no evidence that she exhibited any signs of being under the influence of an intoxicant or controlled substance. Marrón did not ascertain whether Tellier’s name appeared on the lease. The police did not trick or coerce Tellier into consenting to the search. Her will was not overborne. I infer that Tellier was frightened because she had herself signed in the past for a package or packages containing marijuana. I infer that she worried that she might be charged given the mailing labels in the possession of the police that had been shown to her and the contents of the Package that had already been opened after being located in the nursery, although no one threatened her with arrest. I further infer that she was not aware of the cocaine in the kitchen cabinet and acted in her own perceived self-interest in giving consent, thinking that she and the defendant would be better off if they cooperated fully. Her fear did not critically impair her capacity for self-determination. Tellier freely and voluntarily consented to a search of the apartment.
After Tellier granted permission to search, an officer located a plastic bag containing a white powdery substance that appeared to be cocaine. It was in a kitchen cabinet containing food. No kitchen cabinet was opened prior to Tellier’s consent to the search having been given. Shown the substance, Squires stated that it belonged to a friend who had been at his house drunk and left it there. He refused to provide the friend’s name.
Had the mailing label not already been seized from an open trash can in the kitchen, it would have been located moments later during the search of the apartment conducted pursuant to the consent granted by Tellier.
When no one arrived to retrieve the Package, Squires was placed under arrest. Tellier was not arrested.
*150 RULINGS OF LAW
Police officers may conduct a search without a warrant and without probable cause if they have the voluntarily given consent of a person authorized to give consent to the search. United States v. Matlock, 415 U.S. 164, 165-66 (1973). Squires contends thatTellier lacked authority to consent to the search of the apartment because she was not on the lease and did not pay rent. A person, however, such as Tellier, who mutually uses with another the property sought to be searched may properly consent to its search. Commonwealth v. Ploude, 44 Mass.App.Ct. 137, 140 (1998), citing United States v. Matlock, 415 U.S. at 172. The ability to consent does not rest upon the law of property, but rests rather on mutual use of the property by persons generally having joint access and control for most purposes. United States v. Matlock, 415 U.S. at 171 n.7. Here, given that Tellier had been living in the one bedroom apartment with the defendant for four or five months, and resided there with Squires on the day of the search together with their newborn son, and given that both her and her baby’s belongings were kept in the apartment, she had sufficient joint access to and control over the apartment to provide her with actual authority to consent to the search of mutually used areas, such as the kitchen. Squires assumed the risk that Tellier would consent to a search of the kitchen.
Apart from Tellier’s actual authority, she had apparent authority to consent to the search. Cf. See Commonwealth v. Maloney, 399 Mass. 785, 787-88 (1987) (boyfriend appeared to be lawful occupant with authority to permit police to enter); Commonwealth v. Wahlstrom, 375 Mass. 115, 117 (1978) (employee of defendant had sufficient appearance of authority to consent to search). The test is whether, armed with the facts known to the police at the time of the search, a person of reasonable caution would believe that the consenting party had authority over the property. Illinois v. Rodriguez, 497 U.S. 177, 188 (1990). At the time Marrón asked Tellier for consent to search the apartment, Matron knew she had been living there for four or five months; he had observed her and her child there; he knew that she received mail there, and she referred to the bedroom when she sought to enter to nurse as “my bedroom.” A person of reasonable caution would believe that Tellier was a lawful occupant and that she had authority to consent to the search of the apartment. Cf. United States v. Hamilton, 792 F.2d 837, 841-42 (9th Cir. 1986) (homeowner appeared to have custody of motor home parked in her driveway with the door open).
The fact that the defendant himself was present at the apartment and had unequivocally refused to consent to its search did not deprive Tellier of her independent authority, arising from her mutual use of the property, to grant consent to the police. United States v. Morning, 64 F.3d 531, 536 (9th Cir. 1995) (consent to search given by a co-occupant is valid as against the defendant when both are on the scene but the defendant has refused to consent), cert. denied, 516 U.S. 1152 (1996). “Third party consent remains valid even when the defendant specifically objects to it.” United States v. Donlin, 982 F.2d 31, 33 (1st Cir. 1992).[7] See also United States v. Rith, 164 F.3d 1323, 1337 (10th Cir. 1999) (“Matlock is uniformly interpreted as allowing a person with shared authority to grant effective consent to search the common premises despite the objections of the subject of the search”).[8]
While Squires may have thought that Tellier would not be asked to consent to the search of the apartment or that, if asked, she would refuse, when he entered into a joint living arrangement with Tellier, he assumed the risk that, in her own right and acting in her own perceived self-interest, she would expose their commonly shared areas to a search. “Although there is always the fond hope that a co-occupant will follow one’s known wishes, the risks remain. A defendant cannot expect sole exclusionary authority unless he lives alone, or at least has a special and private space within the joint residence.” United States v. Morning, 64 F.3d at 536. The kitchen where the evidence sought to be suppressed in this case was found was not a private place within the apartment exclusively controlled by Squires; rather it was an area of the residence to which the defendant and Tellier had equal access and use. The authority of a co-occupant to consent to search of such a common area is the same whether the defendant is nonconsenting, as is Matlock, 415 U.S. at 166, or specifically objecting at the time of the search. United States v. Hendrix, 595 F.2d 883, 885 (D.C. Cir. 1975) (per curiam).
Squires also contends that even if Tellier had actual or apparent authority to consent to a search of the apartment, her consent, if given, was not voluntary. When the Commonwealth relies on consent as a basis for a warrantless search, it must demonstrate “consent unfettered by coercion, express or implied, . . . [which is] something more than mere ‘acquiescence to claim of lawful authority.’ ” Commonwealth v. Walker, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976) (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). Voluntariness of consent is a question of fact to be determined by taking into account all of the circumstances. Commonwealth v. Harmond, 376 Mass. 557, 561 (1978).
Marrón informed Tellier that she could refuse consent and require the police to get a search warrant. Marrón was not aggressive or overbearing, but rather spoke to Tellier in a conversational tone. He used no threats, trickery, or an unwarranted show of force. Specifically, Tellier was not threatened with arrest; nor was she told that the Department of Social Services would take her infant away if she did not cooperate. The other officers were in the kitchen with Squires and the battering ram had been placed in the hallway *151 shortly after the police entered the apartment. Although Tellier was frightened by the presence of the officers, her fear did not critically impair her capacity for self-determination. Cf. United States v. Freyere-Lazaro, 3 F.3d 1496, 1500-01 (11th Cir. 1993) (mother, distraught over son’s arrest, not too disabled to voluntarily consent to search of her home). Tellier wanted the defendant to cooperate and she wanted to cooperate herself. The fact that, in retrospect, she might regret having granted consent to search does not render the consent that she did give involuntary. The Commonwealth has met its burden of showing that Tellier’s consent was voluntary and not coerced.
Lastly, Squires contends that he is entitled to have the mailing label suppressed because it was seized from the trash prior to any consent to search the apartment being given by Tellier. Several independent grounds, however, justify the warrantless seizure of the label from the trash; Squires’ express consent, the plain view doctrine, and inevitable discovery.
Squires expressly consented to a search of the Package. The consent to search form which Squires signed authorized the police to conduct a search of “one express mail package” and “to take possession of any material which is connected in any way with the investigation they are making.” The mailing label, which was originally attached to the Package and tom from it, is material connected with the investigation of the Package. Because Squires expressly consented to the search of the Package, he is not entitled to have the mailing label suppressed. Cf. United States v. Gay, 774 F.2d 368, 377 (10th Cir. 1985) (vial in plain view in open ashtray in close proximity to glove box may be seized when there has been consent to search glove box).
Moreover, “[u]nder [the plain view doctrine], if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.” Commonwealth v. D’Amour, 428 Mass. 725, 730-31 (1999), citing Commonwealth v. Santana, 420 Mass. 205, 211 (1995). The police were lawfully in the kitchen where McCarran was able to observe part of the label by looking into the uncovered trash container: given the defendant’s signature on the label, a fact already known to the police since McCarran had delivered the Package, the label’s incriminating character was immediately apparent.
The inevitable discovery exception to the exclusionary mle also serves to protect the mailing label from suppression. Commonwealth v. O’Connor, 406 Mass. 112, 117 (1989). The Commonwealth has the burden of proving the facts bearing on inevitability by a preponderance of the evidence. Id. Had McCarran not seized the mailing label from the trash once the defendant told the police that he had discarded it, it would have been found within minutes of its seizure pursuant to the constitutionally proper search conducted in accordance with Tellier’s consent to search the apartment. Moreover, the constitutional violation, if any, was not egregious. Squires had already given McCarran his express written consent to search the Package and the label, originally attached to the Package, had been discarded in the very room where they were speaking and was visible without the need to take the top off any container or open any closed object. If the seizure without explicit consent from Squires and before the consent to search by Tellier was unlawful, the Commonwealth’s case was not aided, nor was the defendant’s case harmed, by the brief, premature discovery of the label. Id. at 119.
In sum, the defendant is not entitled to have the items seized or any statements that may have been made suppressed as fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 481-82 (1963).
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion to suppress be denied.

 At the evidentiary hearing, the defendant made clear that he does not seek to suppress the search of the package at his home; voluntary consent to that search is conceded. The defendant also does not seek to suppress statements he made to the police on Miranda or voluntariness grounds .

 The defendant’s testimony was totally lacking in credibility. For example, he stated that he did not know that the package he signed for was addressed to John Tellier, despite the fact that the addressee’s name is clearly written on the label almost immediately below where he signed. Further, his testimony that he left the package in the hallway and planned to bring it back to the post office because no John Tellier resided at that home is incredulous given the statements which I find he later made to the police.

 There is no credible evidence that Tellier, who was still breast feeding her infant, was experiencing the effects of any prescription pain medication on October 28, 1998 or that she was under the influence of alcohol or any illicit drug. There is also no credible evidence that she was in an unusually emotionally vulnerable state.

 The officer was standing by the door leading to the outside.

 The defendant’s affidavit in support of his motion to suppress states that he “was read his Miranda Rights” and at the hearing he testified that his affidavit was truthful. Nevertheless, contrary to the affidavit, Squires testified that he was never read his Miranda warnings, but only given the written form which he signed. I infer that Squires testified falsely in order to bolster the credibility of Melissa Tellier who had previously testified that Squires was not advised of the right to remain silent or that anything he said could be used against him; she had also testified that from the living room she could hear what was being said in the kitchen and that she went into the kitchen a few times.

 Tellier’s testimony to the contrary is not credible. Tellier concedes that she told the defendant to cooperate.

 But see State v. Leach, 782 P.2d 1035 (Wash. 1989) (en banc) (one’s otherwise voluntary consent to a search is not valid as against a cohabitant of the premises who is present when the search is conducted); Lawton v. State, 320 So.2d 463, 464 (Fla. 1975) (assuming person granting consent had sufficient control over the premises as to authorize her to consent to a search, nevertheless search cannot stand where *152 defendant was physically present on the premises and affirmatively objected to the search).

 See Lenz v. Winburn, 51 F.3d 1540, 1548 (11th Cir. 1995) (Matlocks third-party consent rule applies even when a present subject of the search objects); J.L. Foti Construction Co., Inc. v. Donovan, 786 F.2d 714, 716-17 (6th Cir. 1986) (no reasonable expectation of privacy in jointly occupied property so the fact that the defendant, one of the interested parties, was present and denied consent does not preclude police from conducting search based on consent of other); United States v. Bethea, 598 F.2d 331, 335 (4th Cir.) (by sharing common area with his sister, defendant assumed risk that she might consent to a search of the bedroom at any time, even when he, himself, was present), cert. denied, 444 U.S. 860 (1979); People v. Sanders, 904 P.2d 1311, 1313 (Colo. 1995) (enbanc) (fact that defendant was present when police searched trailer does not vitiate co-occupant’s consent); People v. Haskett, 640 P. 2d 776, 785 (Cal. 1982) (en banc) (rejects need for special rule vitiating consent of one co-occupant when the other is present and protests entry or search), cert. denied, 502 U.S. 822 (1991); People v. Cosme, 379 N.E. 2d 1319, 1323 (N.Y. 1979) (co-occupant’s consent to search bedroom closet effective even though defendant present and refused to give consent).