859 A.2d 303

**STATE of Maryland**

v.

**James ROWLETT.**

**No. 231, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Oct. 7, 2004.

Shannon E. Avery (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

Peter F. Rose (Nancy FOrster, Public Defender, on brief), for appellee.

Panel DAVIS, KENNEY and KRAUSER, JJ.

KRAUSER, J.

Charged with assault and drug and handgun offenses in the Circuit Court for Baltimore City,[1] appellee, James Rowlett, filed a motion to suppress the physical evidence supporting those charges: a handgun that was found by police in his bedroom and a "crack pipe" with drug residue that was found on his person. When the circuit court granted appellee's

---

1. Appellee was charged with first degree assault, second degree assault, possession of a regulated firearm as a convicted violent offender, possession of a controlled dangerous substance ("CDS"), one count possession of CDS paraphernalia, and use of a handgun in the commission of a felony or crime of violence in the Circuit Court for Baltimore City.

motion, the State noted this interlocutory appeal, challenging that ruling.

The State's challenge is twofold: First, it claims that police seized the gun in question pursuant to a lawful consensual search, asserting that the owner of the house where the search occurred, appellee's mother, had consented to the search in question and that she had both actual and apparent authority to do so. And second, it claims that the gun was in plain view when it was seized. Because we agree that the gun was seized pursuant to a lawful consensual search of appellee's bedroom, we shall reverse the ruling of the circuit court that granted appellee's motion to suppress. That being our ruling, we need not, and therefore shall not, reach the State's alternative theory that the gun was in plain view when it was seized by police officers.

As for the pipe, which was found upon appellee's person after his arrest, it should not have been suppressed, regardless of whether the search of appellee's bedroom was proper or not. The police had probable cause to arrest appellee for assault, before and after the search of his bedroom, and the seizure of the pipe, with its illicit residue, was incidental to that arrest.

## SUPPRESSION HEARING

The only witness to testify at the suppression hearing was Officer John F. Rager [2] of the Baltimore City Police Department. He testified that on September 6, 2001, at 9:30 a.m., he and Officer Stacey Flatter were in uniform and in a patrol car when Patricia Ann Farley [3] "literally threw herself in front" of their cruiser. "[H]ysterical" and "jumping up and down," she

---

**2.** At the suppression hearing, Rager identified himself as Detective John F. Rager of the Baltimore City Police Department's Organized Crime Division, Plain Clothes Narcotics Section. He, however, testified that, at the time the offenses and search occurred, he was a uniform police officer with the department.

**3.** Officer Rager testified that the victim's name was Patricia Ann Farley The indictment, however, listed the victim's name as Patricia Ann Holt.

told the officers that a man had pointed a handgun at her and threatened to kill her.

She had met her assailant, whom she later identified as appellee, in the street at 6:30 that morning while she was "jonsing for a hit," that is to say, "looking for a hit of ... crack cocaine." Appellee promised to give her the drug in exchange for oral sex. Ms. Farley agreed and accompanied appellee as he walked to a two-story rowhouse, a block away. When they arrived, they went upstairs to a second floor bedroom, which was "at the top of the stairs." While appellee smoked cocaine from a pipe, Ms. Farley performed her part of the bargain. When she was done, appellee declined to perform his. Instead, he pointed a gun at her and threatened to kill her. The record is blank as to what occurred next but presumably she fled the house and ultimately flagged down Officers Rager and Flatter.

Insisting that she could identify both the rowhouse and her assailant, she then led the officers around the corner to a rowhouse at 4406 Daytona Avenue. When they arrived at the Daytona Avenue address, they went up to the porch and knocked on the front door. Appellee's sister, Nicole Rowlett, answered the door. Officer Rager asked her "if she had a brother or a father or if there were any males inside the house at the time." When Nicole replied that her brother was there, the officer asked if he could speak with him. Nicole agreed and opened the door. Officer Rager entered the house, while Ms. Farley and Officer Flatter remained outside on the front porch of the house.

While the officer was standing in the foyer, appellee approached from the living room. The officer asked him if he knew "the lady [on] the [front] porch." Glancing at her through the front door, appellee replied that he did not and denied that anything had happened that morning. When he did, Ms. Farley could be heard by the officer, exclaiming from the porch, "That's him, that's him." Appellee then became, according to the officer, "extremely agitated" and "angry." The officer asked appellee to step away from the front door,

and Officer Flatter led Ms. Farley from the porch to the sidewalk in front of the house.

As appellee moved away from the front door, a woman entered the house, identifying herself as Bernadine Rowlett and appellee's mother. When the officer informed her that Ms. Farley had accused her son of threatening her with a gun, Mrs. Rowlett stated that appellee "had just got out of jail for doing eight years for a handgun charge." [4]

Officer Rager then informed Mrs. Rowlett that a gun might be in the house and asked her if he could search the front bedroom at the top of the stairs, as that was the room, according to Ms. Farley, where the incident occurred. She agreed and indicated that that room was where her son was staying when her granddaughter, who was "approximately five or six" years old, was not in the house. The room, she stated, was "primarily" her granddaughter's, and appellee "was just staying there." When asked whether appellee was paying any rent, she responded that he was not. After showing police her driver's license for "identification," Mrs. Rowlett signed a consent to search form.

The consent form gave the police permission "to conduct a complete search of [her] residence." Appellee was present when his mother signed the consent form, but apparently did not object to her execution of that document. Nor did he, at any time, ask the police to leave or voice any objection to the search of his bedroom.

He did, however, become visibly agitated and angry, prompting Officer Rager to place him in handcuffs, pat him down and call additional police units to the scene. The officer explained: "I handcuffed him for my safety. It was only two of us and he was a large guy." Although appellee did not say why he was upset, Officer Rager speculated: "I think he was angry at the fact we were there and that the lady was outside and had made the accusation." When defense counsel asked,

---

4. According to defense counsel, appellee had been previously convicted of manslaughter.

"Basically he didn't want you on the premises did he," the officer replied, "He never stated that, but he was angry."

After signing the consent form, Mrs. Rowlett escorted Officer Rager upstairs. She entered the bedroom at the top of the stairs while Officer Rager remained in the hall. Once inside, "she moved [a shoe] box" that was blocking the path into the room. As she did, "the box fell over, and the gun fell out of the box." Observing what had occurred, Officer Rager entered the room, took possession of the gun, and searched the bed and mattress, but found nothing incriminating. After retrieving the gun, Officer Rager went downstairs and informed appellee that he was under arrest. Another officer then searched appellee. That officer found on appellee's person a "crack pipe, a handmade smoking device[,] with white residue" on it.

## SUPPRESSION COURT'S RULING

Although the court found that, because Mrs. Rowlett was "the owner of the property" and "the property [was] not leased to [her] son," she had "a right to go in and take the police in and consent" to a search of appellee's bedroom. Her consent did not "trump," it concluded, appellee's "opposition to the presence of the police on the premises." The court therefore held that the search for and seizure of the handgun was improper and suppressed "the gun [and] evidence of the gun." And, because, in the words of the court, appellee was arrested and searched "based on the finding of the gun," it also suppressed the "crack pipe" with its drug residue on it.

## STANDARD OF REVIEW

In reviewing either the granting or the denial of a motion to suppress, we accept the findings of fact made by the circuit court, unless they are clearly erroneous. *See Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Perkins v. State,* 83 Md.App. 341, 346–47, 574 A.2d 356 (1990). Our review is based solely upon the record of the suppression hearing. *See In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d

691 (1997). And we review that record in the light most favorable to the prevailing party. *See Riddick*, 319 Md. at 183, 571 A.2d 1239; *Cherry v. State*, 86 Md.App. 234, 237, 586 A.2d 70 (1991). We review *de novo*, however, all legal conclusions. *See Riddick*, 319 Md. at 183, 571 A.2d 1239. In other words, we make our own independent constitutional determination of whether the search at issue was lawful. *See id.; Perkins*, 83 Md.App. at 346, 574 A.2d 356.

## DISCUSSION

The State contends that the circuit court erred in granting appellee's motion to suppress. It claims that the seizure of the gun was lawful because appellee's mother had actual authority to consent to the search of her son's room and did. And, even if she did not have such authority, the police reasonably relied upon her apparent authority to authorize such a search. The State maintains, therefore, that the gun found in appellee's room and the pipe found on his person should not have been suppressed.

### The Handgun

 The Fourth Amendment prohibits unreasonable searches and seizures. *See Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *In re Tariq A–R–Y*, 347 Md. 484, 489–90, 701 A.2d 691 (1997). Warrantless searches and seizures are *"per se* unreasonable." *In re Tariq A–R–Y*, 347 Md. at 490, 701 A.2d 691. But, if such a search or seizure "falls within one of a carefully defined set of exceptions, it will be upheld." *Id.; see Gamble v. State*, 318 Md. 120, 123, 567 A.2d 95 (1989); *Turner v. State*, 133 Md.App. 192, 201, 754 A.2d 1074 (2000). One such exception—and of particular relevance here—is a search conducted pursuant to the consent of either the owner of the property searched, *see e.g. Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), or of a third party having common authority with the owner, *see e.g. United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), or apparent authority to consent. *See Illinois v.*

*Rodriguez,* 497 U.S. 177, 187–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *accord Matthews v. State,* 89 Md.App. 488, 496, 598 A.2d 813 (1991).

 Common authority to consent to a search is not derived "from the mere property interest a third party has in the property" searched; rather, such authority rests "on mutual use of the property by persons generally having joint access or control for most purposes." *Matlock,* 415 U.S. at 171, n. 7, 94 S.Ct. 988. And if a person with common authority over the premises consents to a search of the premises, that consent is "sufficient to validate [the] search." *Waddell v. State,* 65 Md.App. 606, 617, 501 A.2d 865 (1985); *accord In re Tariq A–R–Y,* 347 Md. at 492, 701 A.2d 691; *McDonald v. State,* 61 Md.App. 461, 470, 487 A.2d 306 (1985).

 In the absence of such authority, the consent of a third party may still be sufficient to validate a warrantless search if that party has " 'apparent authority.' " *Rodriguez,* 497 U.S. at 187, 110 S.Ct. 2793 (quoting *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964)). That is to say, if the facts available to the officer at the time of the search would " 'warrant a man of reasonable caution' " to believe that "the consenting party had authority over the premises," then the consenting party has apparent authority over the premises and may lawfully consent to a search of it. *Id.* at 188, 110 S.Ct. 2793 (quoting *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also United States v. Mitchell,* 209 F.3d 319, 324 (4th Cir.2000); *Wilkerson v. State,* 88 Md.App. 173, 185–86, 594 A.2d 597 (1991). As the State correctly asserts, *State v. Miller,* 144 Md.App. 643, 799 A.2d 462 (2002), is illustrative of both types of authority.

In that case, we considered whether a father had common or apparent authority to consent to the search of his adult son's bedroom in his house. *Miller,* 144 Md.App. at 646, 655–57, 799 A.2d 462. The father, Rudolph Miller, owned a home that he shared with his son, twenty-six year old Christopher, and his daughter. *Id.* at 646–47, 799 A.2d 462. Christopher's

bedroom was in the basement of the home. *Id.* at 647, 799 A.2d 462.

Receiving a tip that someone was selling drugs out of that basement, two police officers went to the Miller home to investigate. *Id.* Upon their arrival, the officers were met at the front door by Mr. Miller and invited inside. *Id.* An officer explained the purpose of the visit and read the consent to search form to Mr. Miller and his daughter. *Id.* Although Mr. Miller gave verbal permission, stating that he disapproved of drugs in his home, he declined to sign the consent to search form. *Id.* Unclear though it was as to whether Christopher was present when the form was read, he was present during the search of his room. *Id.* at 652, 799 A.2d 462. At no time during the search did he object to that search or challenge his father's right to consent to it. *Id.*

The officers proceeded to the basement and entered Christopher's room. *Id.* at 647, 799 A.2d 462. Although the bedroom door had a lock, *id.* at 648, 799 A.2d 462, the door was, at that time, unlocked and open. *Id.* at 647, 799 A.2d 462. On his dresser, the police found a bag of marijuana. *Id.*

As to whether Mr. Miller had the right to consent to the search of his son's bedroom, we opined "that a parent as an owner, absent evidence to the contrary, has control over and possession of his or her home," including rooms of other family member occupants. *Id.* at 654–55, 799 A.2d 462 (discussing *United States v. Block,* 590 F.2d 535 (4th Cir.1978)(upholding a mother's consent to search her 23 year old child's bedroom because she had access to the room for household purposes); *In re Tariq A–R–Y,* 347 Md. 484, 701 A.2d 691 (1997)(upholding parental consent to search personal effects of a minor child because parent's role as head of the household and as co-tenant of jointly occupied property); *McDonald v. State,* 61 Md.App. 461, 487 A.2d 306 (1985)(upholding consent to search based on adult daughter's status as household occupant and close relative of the owner); and *Waddell v. State,* 65 Md.App. 606, 501 A.2d 865 (1985)(upholding parent's consent to search adult child's bedroom, which he rented for

$20.00 per week, because mother had and appeared to have access to the room)).

The same authority to consent to a search existed in the Miller home. Christopher paid no rent for his room and had no "understanding or agreement" with "his father with respect to [his] expectation of privacy." *Id.* at 656, 501 A.2d 865. Indeed, "[n]othing suggested that [Christopher's] use of the property varied from that of an ordinary family member, and there was no indication," we observed, "that Rudolph Miller's authority as father and owner did not extend" to Christopher's room. *Id.* at 655, 501 A.2d 865. We therefore held that Mr. Miller not only had actual authority to consent to the search, *see id.* at 656, 501 A.2d 865, but that he had apparent authority to do so as well because the police reasonably believed that he had authority to consent the search of Christopher's room. *See id.* at 657, 501 A.2d 865.

■ The circumstances surrounding the search of appellee's room are, in all material respects, similar to *Miller*. When police arrived at the Rowlett home, appellee's sister, Nicole, answered the door and invited Officer Rager inside. When the officer asked whether there were any males present in the home at that time, Nicole informed the officer that her brother, appellee, was there. A few moments later appellee's mother, Mrs. Rowlett, entered the home. She identified herself as appellee's mother and informed the police that appellee had just been released from jail and was staying in her house. She stated that he was using her granddaughter's room when her five year old granddaughter was not. He was not, she informed police, paying rent for the use of the room. She also showed the officer her driver's license as proof of identification.

When Officer Rager informed her that a gun might be in her home and asked permission to search the bedroom "at the top of the stairs," where appellee was staying, Mrs. Rowlett executed a written consent form, allowing the police to search her entire home. Appellee was within a few feet of his mother when she consented to the search. And, although he became

visibly agitated and angry, he did not challenge his mother's right to consent or voice any objection to the impending search of his room. The police had no way of telling whether he was angry over being identified by Ms. Farley as her assailant, or being placed in handcuffs, or police entering the room he shared.

Mrs. Rowlett then escorted Officer Rager upstairs. She entered the room first, while the officer remained in the hallway There was no evidence that the bedroom door was closed or had a lock that would have prevented Mrs. Rowlett from entering it. As Mrs. Rowlett entered the room, she moved a shoe box that blocked the doorway. The box opened and a gun fell out. Seeing the gun, Officer Rager entered the room to take possession of it and to search for additional evidence.

Nothing suggested to the officer that appellee's use of the property "varied from that of an ordinary family member" or that Mrs. Rowlett's authority as his mother and apparently head of the household did not extend to the room her granddaughter and appellee shared. *Miller,* 144 Md.App. at 655, 799 A.2d 462. In fact, by sharing the room as he did, appellee did not have exclusive use of or control over it. Therefore, Mrs. Rowlett had common authority, in her own right and on behalf of her granddaughter, to consent to the search. In addition, Mrs. Rowlett had apparent authority because it was reasonable for Officer Rager to believe that Mrs. Rowlett had the authority to consent to the search.

Appellee contends, however, that *Miller* does not apply to the instant case because, unlike the defendant in *Miller,* he demonstrated an "obvious opposition" to the search, making Mrs. Rowlett's consent insufficient. Appellee is incorrect.

That appellee was present and, in the words of the circuit court, demonstrated "opposition to the presence of the police on the premises" does not invalidate his mother's consent. Although appellee's agitation and anger after having been identified by Ms. Farley and handcuffed by the police cannot be considered consent to search, it also cannot be considered,

**400**

under the circumstances, an objection to it. Appellee was present as Officer Rager advised his mother of the reason for the police visit and asked her consent to search his bedroom. Mrs. Rowlett agreed, signing a written consent to search form. Neither at that time nor thereafter did appellee challenge her right to consent, ask the police to leave, or otherwise voice an intelligible objection to the search of his room.

Moreover, the police had every reason to assume that, if appellee objected to his mother's consent to search or the search itself—and not just to the prospect of returning to jail having been identified by Ms. Farley as her assailant—he would have expressed an objection to the search at that time. He did not. Thus, appellee's anger and agitation cannot be construed as an objection to the search. *See generally People v. Redmond,* 29 Cal.3d 904, 908–09, 176 Cal.Rptr. 780, 633 P.2d 976 (1981)(holding that because defendant urged his mother not to permit police entry into their home without a warrant, "it [was] not clear that defendant in fact had asserted his constitutional right to be free from unreasonable search and seizure" and that "it [was] more accurate to say that defendant was urging his mother to assert *her* Fourth Amendment right").

 Also, even if appellee's behavior could be reasonably construed as an objection to the search, it did not vitiate his mother's consent to that search. Consent to search given by a third party having common authority over the premises is sufficient to authorize a search even when the defendant is present and objects.[5] *See United States v. Hendrix,* 595 F.2d

---

5. Many other federal and state courts have also held that the police may conduct a search based on third party consent, where the consenting party has common authority, even though the defendant is present for the search and objects to it. *See Koch v. Town of Brattleboro, Vermont,* 287 F.3d 162, 168–69 (2d Cir.2002)(Dicta); *United States v. Rith,* 164 F.3d 1323, 1337 (10th Cir.1999); *United States v. Morning,* 64 F.3d 531, 534–36 (9th Cir.1995); *Lenz v. Winburn,* 51 F.3d 1540, 1548 (11th Cir.1995); *United States v. Smalls,* No. 92–5707, 1 F.3d 1235, 1993 WL 303309, at *3 (4th Cir. August 9, 1993); *United States v. Donlin,* 982 F.2d 31, 33 (1st Cir.1992); *United States v. Morales,* 861 F.2d 396, 400 (3d Cir.1988); *United States v. Baldwin,* 644 F.2d 381, 383 (5th Cir.

883, 885 (D.C.Cir.1979); *United States v. Sumlin,* 567 F.2d 684, 687–88 (6th Cir.1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978). "The rationale behind [the common authority] rule is that a joint occupant assumes the risk of his co-occupant exposing their common private areas to such a search." *Sumlin,* 567 F.2d at 688; *see also In re Tariq A–R–Y,* 347 Md. at 492, 701 A.2d 691 (stating that, according to *Matlock,* " 'common authority' [is] a determinative factor in the validation *vel non* of warrantless searches" conducted pursuant to third party consent). "[T]here is no reasonable expectation of privacy to be protected under such circumstances." *Hendrix,* 595 F.2d at 885.

Accordingly, even if we interpret appellee's general opposition to police presence at his mother's home as an objection to the search of his room, that objection does not override his mother's consent. *See Sumlin,* 567 F.2d at 688; *Hendrix,* 595 F.2d at 885. Appellee "assume[d] the risk" that his mother would "expos[e] their common private area to such a search." *Sumlin,* 567 F.2d at 688. That he was present during the search and objected to it does not bear on that risk or the diminished expectation of privacy he had in his room. *See Hendrix,* 595 F.2d at 885. We therefore conclude that Mrs. Rowlett's consent was sufficient to authorize the search of appellee's room.

---

1981); *Brandon v. State,* 778 P.2d 221, 224 (Alaska Ct.App.1989); *People v. Sanders,* 904 P.2d 1311, 1313–15 (Colo.1995); *Commonwealth v. Squires,* 10 Mass. L. Rptr. 147 (Mass.Super.Ct.1999); *State v. Ramold,* 2 Neb.App. 545, 511 N.W.2d 789, 792–93 (1994); *People v. Cosme,* 48 N.Y.2d 286, 422 N.Y.S.2d 652, 397 N.E.2d 1319, 1322–23 (1979); *State v. Washington,* 86 N.C.App. 235, 357 S.E.2d 419, 427 (1987)(Dicta); *State v. Swenningson,* 297 N.W.2d 405, 407 (N.D.1980); *State v. Hightower,* 661 A.2d 948, 960 (R.I.1995)(Dicta); *Fogg v. Commonwealth,* 31 Va.App. 722, 525 S.E.2d 596, 598–99 (2000). There are, however, a few jurisdictions that do not allow police to search based on such consent. *See Shingles v. State,* 872 So.2d 434, 438 (Fla.Dist.Ct.App.2004)(relying, in part, on *Lawton v. State,* 320 So.2d 463 (Fla.Dist.Ct.App.1975)); *Lawton v. State,* 320 So.2d 463 (Fla.Dist. Ct.App.1975); *State v. Benson,* 133 Idaho 152, 983 P.2d 225, 233 (1999)(Dicta); *State v. Leach,* 113 Wash.2d 735, 782 P.2d 1035, 1037–40 (1989)(relying, in part, on *Lawton v. State,* 320 So.2d 463 (Fla.Dist. Ct.App.1975)).

## The "Crack Pipe" and Drug Residue

The State argues, as it did at the suppression hearing, that none of the evidence, including the "crack pipe" that was found on appellee's person, should have been suppressed because the seizure of the gun was lawful. The circuit court disagreed. It found that appellee was arrested and searched incident thereto "based on the finding of the gun" and, because of that, it suppressed the "crack pipe" and the residue. We conclude, however, that even if the search of appellee's room was unlawful, the pipe, with its drug residue, would still be admissible because it was lawfully seized pursuant to appellee's arrest.

Generally, "a police officer with probable cause to believe that a suspect has or is committing a crime may arrest the suspect without a warrant" without violating the Fourth Amendment.[6] *Conboy v. State,* 155 Md.App. 353, 364, 843 A.2d 216 (2004). In Maryland, a police officer may arrest a person without a warrant when the officer has probable cause to believe that a felony crime has been committed out of his presence. *See* Md.Code (2001), § 2–202(c) of the Criminal Procedure Article. And, once a lawful arrested is made, the officer "may search 'the person of the arrestee' as well as 'the area within the control of the arrestee' to remove any weapons or to discover evidence that could be concealed or destroyed." *Conboy,* 155 Md.App. at 364, 843 A.2d 216 (quoting *United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)).

Here, police had probable cause to arrest appellee for first degree assault, a felony, *see* Md.Code (2002), § 3–202 of the Criminal Law Article, before they seized the gun. As

---

6. "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)(quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

defense counsel conceded during his examination of Officer Rager, the officer could have "place[d] him [appellee] under arrest based upon what she [Ms. Farley] sa[id.]" Ms. Farley told police that a man had pointed a gun at her and threatened to kill her. She stated that she could identify both the house in which the incident took place as well as the man who threatened her. She then directed them to the Rowlett home, and, upon seeing appellee, identified him as her assailant, exclaiming, "[t]hat's him, that's him." Thus, shortly after he arrived at the Rowlett home and well before he entered appellee's room, Officer Rager had probable cause to arrest appellee for assault.

 That the police delayed arresting appellee until after they had searched his room did not affect their right to arrest him for the assault, regardless of whether that search proved fruitful or even lawful. The search of appellee's person that followed was incidental to that arrest. Accordingly, we hold that the "crack pipe" and the residue on it, which was found on appellee's person, was lawful and that evidence should not have been suppressed.

**CIRCUIT COURT'S RULING ON APPELLEE'S MOTION TO SUPPRESS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR TRIAL. COSTS TO BE PAID BY APPELLEE.**