67 A.3d 572

**Chad Eason FROBOUCK**

v.

**STATE of Maryland.**

**No. 2061, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

June 6, 2013.

---

264

Martha Gillespie, (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Brian Kleinbord, (Douglas F. Gansler, Attorney General, on the brief), Baltimore, MD, for Appellee.

Panel: MEREDITH, WATTS, and JAMES A. KENNEY III (Retired, Specially Assigned), JJ.

## ON MOTION FOR RECONSIDERATION

KENNEY, J.

A jury sitting in the Circuit Court for Washington County convicted Chad Eason Frobouck, appellant, of manufacturing marijuana. Appellant raises two questions for our review:

- "Did the motions judge err in denying the motion to suppress?"
- "Did the trial court improperly admit prejudicial hearsay?"

For the reasons that follow, we shall affirm the judgment of the circuit court.

### SUPPRESSION HEARING

*Factual And Procedural Background*

At the September 6, 2011 hearing on appellant's motion to "suppress all evidence obtained by police authorities as the result of an illegal search and seizure," Scott Mapes testified that he was the owner of a shopping plaza located on Maugans Avenue in Maugansville, Maryland. Mapes entered into a commercial lease with appellant to rent 18020 Maugans Avenue ("the property") from April 15, 2009 through April 30, 2010. According to Mapes, the property was to be used for appellant's business, in which appellant "and his partner [1] would go to law offices or doctor's office and scan ... paperwork and ... digitize it and keep it on hard drives." [2] Mapes described the lease as being for "one year and then it went on month to month after that." The terms of the lease include, *inter alia*, that:

- rent was due on the first day of each month;

---

1. Appellant identified his "partner" as Christopher Springer.

2. The lease states: "Tenant shall use the Demised Premises for the purpose of conducting thereon and therefrom a fitness and health center business and services normally and usually incident thereto, and no part of the Demised Premises shall be used for any other purpose without the prior consent of Landlord."

- non-payment of rent for a period of five days past the first day of the month "shall constitute an event of default";

- "[u]pon the occurrence of any event of default a party at any time thereafter *may* give written notice to the other specifying such event of default and stating that this Lease shall expire on the date specified in such notice" (emphasis added);

- "[a]ll notice or demands of any kind which either may be required or may desire to serve on the [Tenant] under the terms of this Lease may be served on the [Tenant] (as an alternative to personal service) by leaving a copy of such demand or notice at the [property], or by mailing a copy thereof by registered or certified mail, postage prepaid, addressed to: (a) Tenant at the Demised Premises. . . . Service shall be deemed complete at the time of the leaving of such notice as aforesaid or within two (2) days of mailing same";

- the "[l]andlord shall have access to the [property] . . . during the Tenant's regular business hours for the purpose of inspecting the same and making repairs, or for a period of six (6) months prior to the expiration of the terms of this Lease, to show the property to prospective tenants or purchasers"; and

- the "Tenant shall observe and comply with all laws, ordinances and regulations of public authorities."

Mapes testified that he did not receive a rent payment on August 1, 2010. On August 3, he left voicemail messages on appellant's cellphone and on appellant's partner's cellphone regarding the past due payment. He testified further: "And then a few days later I called both numbers [again] and both are disconnected. A[nd], I sent e-mail. And I asked one of the tenants next door if they'd seen [appellant's] vehicle and they said they hadn't. Ah, I assumed he was cleared out and gone." [3] According to Mapes, telephone and email were "the

---

**3.** Appellant testified that he did not receive any emails or voicemails from Mapes during this period.

way we communicated" and the "methods that ha[d] always worked in the past" to contact appellant when he was late with a rent payment. "Quite often" Mapes would receive payment "the next day."

Mapes did not receive any payment or communications from appellant or his partner. On August 13, Mapes, believing the lease had "expired" and that he was in possession of the property—but acknowledging that he had not notified appellant via postal mail or personal service of any default on the lease—attempted to enter the property. Discovering that "the lock had been changed," he "drilled the lock" and entered the property, the interior of which he described as "thrashed."

Once inside, he observed "lots of pot," and called the police. Sheriff's Deputy Matthew Bragunier responded to the call, and, after Mapes "invited" Deputy Bragunier inside to view the marijuana, the deputy called for backup. Agent Bryan Glines of the Narcotics Task Force ("NTF") later arrived.

Mapes testified that he "immediately" consented to the officers entering the property and "allowed" them "access to [the] premises." He explained to them that the tenant had left, and that he had "taken possession" of the property. He signed a consent form after the "second officer" arrived.

Deputy Bragunier testified that, when he responded to Mapes's call, the door to the property was already open [4] and "Mapes was fidgeting with the locks...." From outside the property, Deputy Bragunier did not see any contraband, but he smelled an "overwhelming, strong" scent of unburnt marijuana. According to Deputy Bragunier, Mapes "identified himself as the landlord, the owner of the strip mall" and "invited" the deputy onto the property. When they

entered the threshold, room one, I noticed a bunch of ... buckets full of potting soil with broken stems. Ah, ... as we went down the hallway I looked in room number two. Saw numerous, ah, sapling, little youngling (sic) marijuana

---

4. Mapes also testified that the door was open when the police arrived.

plants. That's when I immediately exited the premises and contacted NTF.

Agent Glines and his supervising sergeant, Sergeant Kerns, responded. Agent Glines testified that "as soon as I arrived I spoke with Deputy Bragunier" who indicated that he had entered the property and "saw what he believed to be marijuana plants." Agent Glines called the "attorney in [his] office," who advised him to have Mapes "sign a consent to search form...." The following colloquy ensued between appellant's counsel and Agent Glines:

Q. Did you have an opportunity to speak with the landlord?

A. I did.

Q. Did you understand him to be the landlord, not the tenant?

A. That's correct.

Q. Did he advise you that he forced entry into the ... building?

A. Ah, I knew he made entry, I wasn't sure ... if he forced entry. I don't recall if he advised me on how he made entry.

✳     ✳     ✳

Q. And you ... took the consent from the landlord,[5] as opposed to the consent from the tenant?

A. Correct. Ah, speaking with the landlord, he advised that the lease ha[d] ... expired. Therefore, the property was owned by the owner of the property.

At the conclusion of the testimony, the prosecutor, on the merits of the suppression motion, stipulated that "if the landlord could legally enter the premises, then the police could [too]. And if the landlord could not, then it was not an okay entry" by the police. Contending that Mapes indeed could "legally enter [the] property," and thus could also "invite the police in to inspect what he had seen," the prosecutor high-

---

**5.** Agent Glines testified that Mapes signed a consent form.

lighted certain provisions of the lease, such as the landlord's right to inspection, and appellant's alleged breach of other provisions of the lease, including the payment of rent and the duty to comply with all laws. The prosecutor also argued that appellant had abandoned the property, or that the lease, due to nonpayment, had "defaulted" and "expired," either of which gave Mapes "the right to repossess the property."

While also countering that neither the landlord's right of inspection nor the tenant's alleged failure to comply with the law permitted Mapes to enter the property on August 13, appellant's counsel principally asserted that, "[a]bsent written notice," Mapes "did not have the ability to legally enter" the property. "And if he did not have the ability to legally enter" the property, "then based on the [stipulation] with the State, the officers did not have the ability to legally enter" the property.

The motions court found that appellant had standing to challenge the search because he had a "month to month lease that began by agreement of the parties after the expiration of the year and one half month written lease. And ... there [were] never eviction proceedings or anything else to remove him from his leasehold." The motions court also found that appellant

had an expectation of privacy in his leased premises under the written lease, which converted to a month to month tenancy after the one year and half a month. At some point thereafter he may have abandoned [the property] ... by not doing anything when he got back into the country from Cairo and Paris in September of 2010, seeing the "For Lease" sign and going away. . . . [6]

I don't find that he abandoned the property any time until then. It sounds like it was his expectation that Mr. Springer was going to pay the rent or somehow this lease would

---

6. Appellant testified that he left the country some time between August 11 and August 13. When he returned to the United States in late September, he "went by the building and it was empty," and there was a "For Lease" sign on the premises.

continue in some way. And just because the rent wasn't paid on August [1], when the lease provisions give him a grace period and have to be written notice before ... the defect in the failure to pay rent can be cured by some other means. Ah, all those things lead me to believe that as of August [13], he thought he had a leased premises ... even though he was in Paris or Cairo [at that time].

Notwithstanding its finding that appellant had standing and an expectation of privacy in the property, the court denied the motion to suppress. First, it observed that Mapes, in entering the property, was "not a State agent. He [wa]s not acting for the police." Thus, "whether he technically violated the terms of the lease or not, I don't think matters to whether or not this was a Fourth Amendment intrusion by the police." [7]

Second—and although the prosecutor had argued that Mapes had *actual authority* to consent to the search by the police and stipulated that the State was not relying on apparent authority—the court found that the officers acted reasonably in relying on Mapes's *apparent authority:*

... [A] warrant wouldn't have been a bad idea. It wouldn't have hurt anything. But based on what Mr. Mapes said, based on his *apparent authority* to invite the police in, based on his reasonable belief that he had a right to enter and the police's therefore reasonable belief that they had a

---

**7.** The court also found that Mapes's actions in entering the property that he thought had been abandoned were "reasonable for a couple reasons":

It could have been a faucet running. There could have been ... some other commercial appliance running in there that, you know, this place is apparently abandoned. I'm not finding it was abandoned. But I'm finding it was apparently abandoned as far as Mr. Mapes knew from his practice that he felt it was reasonable to enter in.

There could have been somebody seriously injured in there. There could have been someone working on their computer scanning business and ... had a heart attack and they're laying in there either dead or in serious health concerns. There's lots of reasonable reasons Mr. Mapes had on August [13] to drill through the lock and go in there. Once he did he saw this illegal activity.

right to enter I don't find this was an unreasonable search and seizure by Deputy Bragunier or by Officer Glines.

... [B]y the time the State got involved [they weren't] on a fishing expedition or snooping in. They were being le[d] into a commercial residence by the landlord who had a reasonable reason to enter the premises and had a reasonable reason to ask the police to accompany him. That when the police were in there they lawfully could seize anything that they saw or smelled in plain view or scent.

(Emphasis added).[8]

### Discussion

The Court of Appeals has stated:

[The] review of a Circuit Court's denial of a motion to suppress evidence under the Fourth Amendment is limited, ordinarily, to information contained in the record of the suppression hearing and not the record of the trial. When there is a denial of a motion to suppress, we are further limited to considering facts in the light most favorable to the State as the prevailing party on the motion. In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to the weighing and determining first-level facts. When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his findings are clearly erroneous. Even so, as to the ultimate conclusion of whether an action taken was proper, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case.

*State v. Collins,* 367 Md. 700, 706–07, 790 A.2d 660 (2002) (internal citations omitted).

■ The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amend-

---

8. The transcript does not reflect any objection, by appellant's counsel, to the court's reliance on apparent authority in its ruling, or any discussion generally of that subject after the court announced its ruling.

ment in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), includes "two separate clauses, the first protecting the basic right to be free from unreasonable searches and seizures and the second requiring that warrants be particular and supported by probable cause." *Payton v. New York,* 445 U.S. 573, 584, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). It states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

"The touchstone of the Fourth Amendment is reasonableness[.]" *United States v. Knights,* 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). With this in mind, the Supreme Court has consistently affirmed that searches and seizures "conducted outside the judicial process," *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), *i.e.,* without "a judicial warrant ... issued by a neutral magistrate after finding probable cause," *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), both "are presumptively unreasonable," *Payton,* 445 U.S. at 586, 100 S.Ct. 1371, or *"per se* unreasonable under the Fourth Amendment[.]" *Katz,* 389 U.S. at 357, 88 S.Ct. 507.[9] This "traditional view" of the Fourth Amendment, Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment,* 1998 U Chi Legal F 261, 262 (1998), has been applied equally to searches and seizures, occurring both inside and outside constitutionally protected areas. *See Payton,* 445 U.S. at 585–88, 100 S.Ct. 1371; *See v. Seattle,* 387 U.S. 541, 546, 87

---

**9.** Warrantless searches are *per se* unreasonable "only in the sense that the police must secure a warrant unless they can demonstrate that the case fits within one of a number of specific exceptions that the Court has fashioned." Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment,* 1998 U Chi Legal F 261, 267 (1998).

S.Ct. 1737, 18 L.Ed.2d 943 (1967) (Warrant requirement applies "to business as well as to residential premises.").

The warrant requirement is subject ... to a few specifically established and well-delineated exceptions, one of which is a search conducted pursuant to consent. When the State argues that a search was conducted pursuant to consent, it has the burden of proving that the consent, in fact, was given freely and voluntarily.

*Abeokuto v. State*, 391 Md. 289, 334, 893 A.2d 1018 (2006). "[A]uthority to consent to a search requires a considered judgment of both factual circumstances and legal issues," *United States v. Kim*, 105 F.3d 1579, 1582 (9th Cir.1997), *i.e.*, the "totality of the circumstances." *Abeokuto*, 391 Md. at 334, 893 A.2d 1018. The consent of the owner of the property searched may serve to validate a property search ("actual authority"). *State v. Rowlett*, 159 Md.App. 386, 395, 859 A.2d 303 (2004) (internal citations omitted). Generally speaking, however, a landlord cannot consent to the search of his tenant's property *when the lease is still valid. See Chapman v. United States*, 365 U.S. 610, 616, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); 31 A.L.R.2d 1078, *4 ("In the few cases in which the person consenting to the search was the lessor of the person invoking the constitutional immunity, it has been uniformly held that the landlord's consent will not, of itself, render the search legal.").

The consent of a third party having either "common" or "apparent" authority over the property may also serve to validate a property search. *Rowlett*, 159 Md.App. at 395, 859 A.2d 303 (internal citations omitted). We have explained the difference between the two:

Common authority to consent to a search is not derived "from the mere property interest a third party has in the property" searched; rather, such authority rests "on mutual use of the property by persons generally having joint access or control for most purposes." And if a person with common authority over the premises consents to a search of the

premises, that consent is "sufficient to validate [the] search."

*Id.* at 396, 859 A.2d 303 (internal citations omitted). Apparent authority exists when

the facts available to the officer at the time of the search would " 'warrant a man of *reasonable* caution' " to believe that "the consenting party had authority over the premises," then the consenting party has apparent authority over the premises and may lawfully consent to a search of it.

*Id.* (emphasis added) (internal citations omitted).

The Supreme Court has rested the constitutional validity of apparent authority on reasonableness:

It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable.

\* \* \*

We see no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search. Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably. The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.

*Illinois v. Rodriguez,* 497 U.S. 177, 185, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

■■■■ The doctrine of apparent authority:

* is not restricted to residences, *see United States v. Gonzalez,* 609 F.3d 13, 19 (1st Cir.2010) ("The doctrine of apparent authority to consent to searches of physical spaces is not limited to residences where people live.");

* places "some responsibility on the officer to assess the situation critically," *United States v. Almeida–Perez,* 549 F.3d 1162, 1170 (8th Cir.2008), such that "[e]ven when the invitation is accompanied by an explicit assertion that the person [giving consent] lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry," *Rodriguez,* 497 U.S. at 188 [110 S.Ct. 2793]; and

* "applies [only] to mistakes of fact [and] not mistakes of law." *Moore v. Andreno,* 505 F.3d 203, 209 (2d Cir.2007) (quoting 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.3(g), at 175 (4th ed.2004)). Thus, "an investigator's erroneous belief that landl[ords] are generally authorized to consent to a search of a tenant's premises could not provide the authorization necessary for a warrantless search." *Id.* (quoting *United States v. Brown,* 961 F.2d 1039, 1041 (2d Cir.1992) (per curiam)).

Appellant contends that the motions court erred in denying the motion to suppress because, during the motions hearing, the State had "stipulated that the only issue was actual authority." According to appellant, in light of the State's concession on apparent authority, there was no reason for appellant's counsel to question the officers on their understanding of Mapes's authority to consent to their entry into the premises, and a record demonstrating the reasonableness (or lack thereof) of the officers' reliance on Mapes' representations, as is necessary under an apparent authority analysis, was not developed at the hearing. More specifically, counsel

contended that the record does not reveal whether the officers asked Mapes "to see the lease," "to see the authority," or "what the terms of the lease were?" In appellant's view, the motions court "drew" its conclusion regarding *apparent authority* "out of 'whole cloth' " because the parties were focused on *actual authority* during the motions hearing. He argues that, in the interests of fairness, the court could not "all of a sudden rule in a manner that is contrary to any of the arguments or any of the evidence that was already presented." [10] Assuming that apparent authority could not support the entry onto the premises, appellant also argues that Mapes's drilling of the lock and entering onto the property were a violation of the terms of the lease, and, thus, Mapes did not have the actual authority to consent to the police's entry onto the property.[11]

The State responds that "[t]he alleged violation of the lease agreement has no effect on the constitutionality of the search later conducted by law enforcement" because:

> Based on the information available to him at the time, [Deputy Bragunier] reasonably believed that Mr. Mapes was the property owner in valid possession of the premises and had the authority to consent to the search. Later, when Agent Glines arrived, he was presented with the same information in addition to Deputy Bragunier's observations

---

**10.** Appellant, citing *Greenstreet v. State*, 392 Md. 652, 898 A.2d 961 (2006), and *Rush v. State*, 403 Md. 68, 939 A.2d 689 (2008), acknowledges in his motion for reconsideration that a court is not bound by stipulations on a matter of law and that the judgment of the circuit court can be upheld on any ground supported by the record. Appellant contends that, based on the State's reliance on *actual authority* at the motions hearing, he was denied the opportunity to adduce evidence or to question the witness on *apparent authority*. Therefore, a finding of apparent authority was not adequately supported by the record. The State, in its opposition to the motion for reconsideration, responds that the reasonableness of the officers' reliance on Mapes's apparent authority to consent was explored by questions asked in appellant's examination of Mapes and both Deputy Bragunier and Agent Glines.

**11.** Because we hold that apparent authority *did* support the entry onto the premises, we do not analyze appellant's argument regarding actual authority.

made during the initial search. Both officers acted reasonably by relying on the consent of a property owner who appeared to have rightfully retaken possession [of] the property following [appellant's] abandonment of the property and violation of the lease.

*     *     *

Because the officers['] reliance on Mr. Mapes['s] consent was based on information presented to them that would warrant a man of reasonable caution to believe that [Mapes] had the authority to give consent, the search was reasonable and not violative of the Fourth Amendment.[12]

At oral argument, the State argued that:

- during the motions hearing, appellant's counsel "had and took the opportunity to [question] both of the officers and also Mr. Mapes about what he told the officers, . . . which plays directly into" an apparent authority analysis;

- Mapes also had actual or common authority to consent to the search; and

- "the officers responding to the scene are entitled to accept the representations of the person who called

---

12. The State has not argued that, by virtue of Deputy Bragunier smelling unburnt marijuana emanating from the property, there were "exigent circumstances" supporting a warrantless entry. *See, e.g., Payton v. New York,* 445 U.S. 573, 584, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). Moreover, the information available to the deputy was that the property had been vacated, and thus, could be secured had a warrant been necessary. The Court of Appeals has recognized that, in some cases, "the mere observation of . . . a crime may provide its own exigency" when the police "observe the perpetrator actively so engaged" in the commission of that crime. *Dunnuck v. State,* 367 Md. 198, 217, 786 A.2d 695 (2001). "[A] crime is considered as being committed in the presence or view of an officer when any of his senses," including those of sight, smell and sound, "afford him knowledge that it is being committed." *Griffin v. State,* 200 Md. 569, 575, 92 A.2d 743 (1952) (citing *Bass v. State,* 182 Md. 496, 505, 35 A.2d 155 (1943)). In this case, appellant could not be observed because he was not present.

them," without examining the actual provisions of the lease.

■ We are not persuaded that the court erred in denying appellant's motion to suppress based on Mapes's apparent authority to consent to the officers' entry into the premises. Moreover, we are persuaded that the record adequately supports a finding that the officers' reliance on his apparent authority was reasonable under the circumstances.

■ First, while Mapes did not provide written consent for the search until after Deputy Bragunier had already entered the property, Mapes testified that he "immediately" consented to the officers entering the property and "allowed" them "access to [the] premises." "It is well established . . . that a valid consent to search may be oral." *Manzi v. State*, 56 S.W.3d 710, 719 (Tex.App.2001); *see also Rowe v. State*, 363 Md. 424, 429, 769 A.2d 879 (2001) ("the petitioner consented both verbally and by signing a written consent form"); *Rich v. State*, 205 Md.App. 227, 237, 44 A.3d 1063 (2012) ("appellant consented verbally to a search of his person"); *United States v. Pollaro*, 733 F.Supp.2d 364, 370 (E.D.N.Y.2010) ("oral consent was sufficient to validate the search").

Second, Mapes testified that he believed appellant had "cleared out and gone," and he "told [the officers] that this . . . is a person that's left" and that he had "taken possession" of the property. Agent Glines testified that Mapes "advised that the lease ha[d] . . . expired. Therefore, the property was owned by the owner of the property." The door to the property was wide open when the officers arrived and they did not know that appellant had drilled the locks. There was no indication that a tenant was still occupying the premises.[13]

---

**13.** At oral argument, appellant's counsel stated:

Deputy Bragunier, you can be sure, knew, when he arrived on the premises—had probably served many orders to quit the premises or ejectment notices, I mean any Deputy does that as part of his routine

Even if Mapes lacked actual authority to consent to a search of the property, under the circumstances presented in this case, the officers acted reasonably in relying on Mapes's representations that he had rightfully "taken possession" of the property and could therefore grant the officers valid consent to enter. Appellant has not pointed out any "surrounding circumstances" that would, in our view, require the officers to make "further inquiry" into Mapes's authority to consent.

Nor could it be argued that the officers' belief in Mapes's apparent authority was based on a mistake of law on their part, for, although "an investigator's erroneous belief that landl[ords] are generally authorized to consent to a search of a tenant's premises could not provide the authorization necessary for a warrantless search." *Moore v. Andreno*, 505 F.3d 203, 209 (2d Cir.2007) (quoting *United States v. Brown*, 961 F.2d 1039, 1041 (2d Cir.1992) (per curiam)). Here, Mapes had represented to the officers that the lease had expired and he had retaken possession of the property.

## TRIAL

### *Factual And Procedural Background*

During direct examination, the following colloquy occurred:

> duties. So he knows ... what the law is of landlord tenant, you can be sure of that.
>
>          \*      \*      \*
>
> *Being overdue in your rent doesn't mean you can enter the property.* You have to have an order to quit or an ejectment notice, and the Deputy obviously knew that because he had experience in law enforcement.
>
> (Emphasis added). This argument rests on a tenant's failure to pay rent, but the failure to pay rent was not the only reason Mapes communicated to the officers as to why he was in possession of the property. He also indicated that the lease had expired and he had taken possession of the property after he believed the tenant had left. Deputy Bragunier testified that Mapes indicated that appellant "had failed to pay rent and he made entry into the building," but it would not be particularly unusual for a tenant to leave a leased premises with rent owing.

[Prosecutor:] Okay. And did you have occasion to respond to 18020 Maugans Avenue in Maugansville, Maryland?

[Deputy Bragunier:]   Yes. . . .

[Prosecutor:] And why did you respond to that location?

[Deputy Bragunier:]   I was dispatched there for a suspected marijuana grow.

[Appellant's Counsel:]   Objection.

The Court:  Grounds[?]

[Appellant's Counsel:]   Hearsay.

The Court: This is, ladies and gentlemen, a non-hearsay purpose.  It's not offered for the truth of the matter asserted, but only a statement or assertion that the deputy received to take some further action.  So with that non-hearsay purpose, it's . . . admissible.

Later, the following colloquy occurred:

[Prosecutor:] And on [August 13, 2010], did you have occasion to respond to Maugansville, Maryland?

[Agent Glines:]   That's correct.

[Prosecutor:] Why did you go there?

[Agent Glines:]   I responded to that location.  I was called by Deputy Bragunier. . . . Advised that—

[Appellant's counsel:]   Objection.[14]

The Court: Overruled.  Again, it's for a non-hearsay purpose, that is, he received a statement, not necessarily that the statement is truthful, but he received this statement and took some action.

### Discussion

Citing *Zemo v. State*, 101 Md.App. 303, 646 A.2d 1050 (1994), appellant avers that, in overruling these objections, "the trial court improperly admitted prejudicial hearsay" because "the reasons for the police officers' appearance at the . . . property were not 'relevant to a material issue in the case'

---

14.  Agent Glines was cut off by appellant's counsel's objection before he had the opportunity to state why he was called to the scene.

but conveyed to the jury the message that [a]ppellant's guilt was a foregone conclusion...." The State responds that, because the statements were not offered as "substantive evidence" to prove the presence of marijuana on the property, but, rather, were offered to explain "the circumstances" which brought the officers to the scene to investigate," the statements "were not offered for the truth of their content," and thus were not hearsay.

■ " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5–801(c). A statement that "is not offered for the truth of the matter asserted ... is not hearsay and it will not be excluded under" Rule 5–802. *Stoddard v. State*, 389 Md. 681, 689, 887 A.2d 564 (2005). That said, however, "extrajudicial [non-hearsay] statements which explain police conduct, but nonetheless directly implicate the defendants, are excluded typically as overly prejudicial." *Morris v. State*, 418 Md. 194, 226, 13 A.3d 1206 (2011). Ordinarily, we review a trial judge's determination on the admission of evidence for abuse of discretion, *Hopkins v. Maryland*, 352 Md. 146, 158, 721 A.2d 231 (1998), but whether evidence is hearsay is an issue of law reviewed *de novo*. *Parker v. State*, 408 Md. 428, 436, 970 A.2d 320 (2009).

In *Zemo*, at Zemo's trial for breaking and entering, Detective Augerinos, who was the lead investigator,

> testified, over objection, that he received evidence about the crime from a confidential informant, that the informant's information put him on the trail of [Zemo] and other suspects, that other parts of the informant's information were corroborated and turned out to be correct, and that, acting on the informant's information, he arrested [Zemo].

101 Md.App. at 306, 646 A.2d 1050. At trial, the State had insisted "that the information was 'not offered for the truth of the matter asserted' but was only offered as 'to why [the detective] went where he went,' " as part of the State's attempt to " 'lay out the course of the investigation[.]' " *Id.* at 309–10, 646 A.2d 1050. This Court disagreed, stating: "[t]he

only possible import of such testimony was to convey the message that the confidential informant 1) knew who committed the crime, 2) was credible, and 3) implicated [Zemo]." *Id.* at 306, 646 A.2d 1050. In holding this to be not "material" to the case in-chief, we characterized it as the product of "a sustained and deliberate line of inquiry that . . . had no other purpose than to put before the jury an entire body of information that was none of the jury's business." *Id.* "The jury . . . has no need to know the course of an investigation unless it has some direct bearing on guilt or innocence." *Id.* at 310, 646 A.2d 1050.

■ Here, the objected-to statements of Deputy Bragunier and Agent Glines were not offered to prove the truth of the matter asserted—that there was a "marijuana grow"—but, rather, to explain *briefly* what brought the officers to the scene in the first place. This was not a "sustained and deliberate" line of questioning like that in *Zemo* which we held to have served "no legitimate purpose." *Id.* at 306, 646 A.2d 1050. Nor, as in *Zemo,* was it intended to put before the jury the testimony of someone who was not testifying in this case.

In addition, these objected-to statements were cumulative to other statements which were *not* objected to: Mapes's testimony that he observed "[a] lot of marijuana growing in every room" when he entered the property, which caused him to call the police, and Agent Glines's testimony that, in providing backup to Deputy Bragunier, the deputy had "[s]tated that he responded to a call where there w[ere] possible marijuana plants." Thus, even if the objected-to statements were inappropriate and should not have been admitted, we perceive no undue prejudice and are satisfied that they "did not ultimately affect the jury's verdict given the cumulative nature of the[se] similar statements." *Yates v. State,* 429 Md. 112, 124, 55 A.3d 25 (2012).

■ Finally, even if the officers' statements were admitted in error, their admission was, under the circumstances, harmless error. "[E]rror in admitting [alleged] hearsay is subject to a harmless error review." *Webster v. State,* 151

Md.App. 527, 553, 827 A.2d 910 (2003) (citing *Baker v. State*, 332 Md. 542, 560, 632 A.2d 783 (1993)). "The harmless error rule 'embod[ies] the principle that courts should exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial.'" *Barksdale v. Wilkowsky*, 419 Md. 649, 657–58, 20 A.3d 765 (2011) (quoting *Williams v. State*, 394 Md. 98, 120, 904 A.2d 534 (2006) (Raker, J., dissenting)). To prevail in a harmless error analysis, the beneficiary of the alleged error must satisfy the appellate court "that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict." *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976). "'To say that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.'" *Bellamy v. State*, 403 Md. 308, 332, 941 A.2d 1107 (2008) (quoting *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir.1997)).

As the State points out:

> In this case, the evidence in the record supporting [the] conviction is substantial. Jurors were presented with the signed lease connecting [appellant] to the premises, photographs of the premises showing the marijuana plants and grow operation, [and] a marijuana "Grower's Guide" and packaged marijuana seized from the premises. Mr. Mapes testified to leasing the commercial space to [appellant]. Deputy [Bragunier] testified to his observations as the first police officer to respond to the premises. Agents Glines and Toston, of the [NTF], gave detailed accounts of their observations and described the equipment and materials found on the premises which were connected with the grow operation. Forensic scientist Jeffrey Kercheval identified the seized plant material positively as marijuana. [Appellant's] ex-wife, Ashley Alilo, testified to a conversation in which [appellant] admitted to her that he had been growing marijuana to make money to see their children.

(Internal citations omitted). In sum, we agree with the State that "[i]n the face of such evidence the alleged error" did not "contribute to the guilty verdict."

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**