*Sean Prince Hallowell v. State of Maryland,*
**No. 1275, September Term 2016**

**CRIMINAL LAW –**

Appellant was convicted of second-degree murder and use of a firearm in the commission of a crime of violence. The State prosecuted under both a specific-intent theory and a felony murder theory. At trial, in accordance with then law and pattern jury instruction, the jury was instructed that first-degree assault was a valid predicate felony for second-degree felony murder. Subsequently, the Court of Appeals, overruling its prior opinion, held that first-degree assault cannot serve as the predicate felony. *State v. Jones*, 451 Md. 680, 708 (2017). Recognizing plain error, **held** that the conviction for second-degree murder is reversed. The State contends that, nevertheless, the handgun conviction should be affirmed because if the jury found appellant guilty of specific-intent murder, it found a felony and a crime of violence, and if it found appellant guilty of felony murder, it found first-degree assault, a felony and a crime of violence. **Held**, the conviction for use of a firearm in the commission of a crime of violence is also reversed because it is unclear whether the jury found appellant guilty on a specific-intent theory or a felony murder theory; appellant was not charged with first-degree assault; and after reversing the murder conviction, appellant does not stand convicted of a felony or a crime of violence.

Circuit Court for Prince George's County
Case No. CT130589X

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1275

September Term, 2016

_____

SEAN PRINCE HALLOWELL

v.

STATE OF MARYLAND

_____

Wright,
Shaw Geter,
Eyler, James R.
  (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Eyler, James R., J.
_____

Filed: February 1, 2018

Sean Prince Hallowell, appellant, was charged with second-degree murder and use of a firearm in the commission of a crime of violence. The State proceeded under both a specific-intent theory as well as a felony-murder theory, and the jury was instructed, in accordance with Maryland law at the time of his trial, *Roary v. State*, 385 Md. 217 (2005), and without objection, that first-degree assault (an uncharged offense in this case) was a valid predicate felony for second-degree felony murder. The jury, sitting in the Circuit Court for Prince George's County, convicted appellant of both offenses, and he noted a timely appeal. During the pendency of that appeal, the Court of Appeals overruled *Roary*, holding "that first-degree assault that results in the victim's death merges with the homicide and therefore cannot serve as an underlying felony" for second-degree felony murder. *State v. Jones*, 451 Md. 680, 708 (2017). Appellant raises the following issues, which we have reordered for clarity[1]:

> I. Did the trial court err when it instructed the jury?
>
> II. Did the trial court err when it denied appellant's motion to dismiss for a speedy trial violation?
>
> III. Did the trial court err when it permitted the State to introduce a CAD [computer aided dispatch] report, when the report contained inadmissible hearsay?

For the reasons that follow, we shall reverse the judgments and remand for further proceedings.

---

[1] We consider issue I first, because our resolution of that issue requires reversal. We address appellant's issue III, the speedy trial claim, second, because a resolution of that issue in favor of appellant would prevent a remand. Finding no speedy trial violation, we then address appellant's issue II, involving admission of the CAD report, because that issue is likely to arise upon remand.

**BACKGROUND**

Taken in a light most favorable to the State, the evidence adduced at trial established the following:

During the evening of February 7, 2013, appellant, Charles "Chucky" Thompson, Terrance "TJ" Stoney, and Gary "Big Man" Bishop gathered together at a friend's house[2] to consume drugs and alcohol. Some of the partygoers were drinking alcoholic beverages, some were smoking "weed," and others were "drawing cocaine."

As the party drew to a close, appellant, Thompson, Stoney, and Bishop left in separate cars. Appellant was the first to leave, followed by Thompson, who was driving a bluish grey Chevrolet Malibu, and then Bishop and Stoney, who left together in Bishop's white Lexus. All of them ultimately reconvened outside of the home, in Forestville, Maryland, where appellant lived with his mother and sister as well as Gary Bishop.

After appellant had left the party but before the others did, he called Bishop and asked him to retrieve a bag of cocaine that he had left in Thompson's car. Bishop asked Thompson to produce the cocaine, and Thompson gave Bishop a bag containing just "crumbs." Bishop informed appellant, who replied that he had given Thompson "a full bag" and that he would "be back." Appellant never returned to the party.

When Bishop and Stoney arrived outside of appellant's home, they were met by another friend, identified in the record only as "Daronte," who drove a gray Chevrolet

---

[2] That friend was also named "Charles."

Monte Carlo. Daronte was accompanied by another man, whom Bishop identified as Daronte's "cousin" or "little brother" and whom Stoney identified as "Marcus." As Daronte and Marcus sat in the Monte Carlo, Stoney stood outside the driver's side door, smoking marijuana with Daronte, while the trio watched a music video that Daronte was playing in his car. Bishop was also nearby, although Stoney was "not sure" where he was. At that time, Bishop's car was parked behind Daronte's Monte Carlo, with space between the two vehicles sufficient for another car.

Thompson was the next to arrive, pulling up in his bluish grey Malibu and parking in the space between Daronte's Monte Carlo and Bishop's Lexus. Shortly thereafter, appellant arrived, in a "black" car driven by an unidentified woman. Appellant exited the vehicle, walked over to Thompson's vehicle, and "pulled [him] out [of] the car." Thompson then approached Bishop and asked him whether he had "[said] anything to his cousin about his cocaine." Before he could say anything else, appellant "grabbed" Thompson, "pulled [him] toward his chest," and "[s]hot him in the head" with a handgun.

Appellant picked up Thompson, carried him to his Malibu, placed him in the back seat, climbed in the front seat, and drove away. Shortly thereafter, Officer Mosell Jones, Jr., of the Prince George's County Police Department, received a 911 call, informing him that there had been a report of shots fired in "the 2500 or 2600 block of Timbercrest Drive," near appellant's home. When he arrived, Officer Jones encountered Bishop and Stoney, who gave conflicting accounts of whether there had been a shooting and from what direction, if any, the gunshots had been fired.

3

"[J]ust after midnight" on February 8, 2013, Richard Peterson, a volunteer firefighter stationed at the nearby Ritchie Volunteer Fire Department,[3] was awakened by a ringing doorbell. Upon answering the doorbell, Peterson encountered a "black male," matching the description of appellant, "saying that there was somebody who needed our help," but he "wouldn't elaborate on what exactly was wrong." Peterson walked over to the fire truck, grabbed a flashlight and jacket and, accompanied by another firefighter, walked to the parking lot alongside the fire station. By that time, appellant, according to Peterson, was already across the street at a nearby 7-Eleven, having "made incredibly good time making his way down that way." Peterson and the other firefighters then discovered a Chevrolet Malibu, in the middle of the driveway, with its engine running and its headlights on, and all of its doors closed. Upon further examination, they found the victim, Thompson, slumped in the rear, "suffering from a gunshot wound to the left temple." Thompson still "had a pulse but . . . was not breathing spontaneously" when firefighters first discovered him slumped in the back seat of his car. The emergency responders administered cardio-pulmonary resuscitation ("CPR") to him, but he did not respond and died shortly thereafter.

When appellant approached the door of the fire station, he inadvertently dropped his wallet on the ground, and it was recovered about an hour later by Steve Wilson, a volunteer firefighter who was reporting to the station to begin his shift. Wilson notified the police, who identified appellant as a suspect in the murder.

---

[3] Peterson is also a Sergeant in the District of Columbia Fire Department.

4

On April 9, 2013, a grand jury returned a two-count indictment, charging appellant with murder in the first degree and use of a handgun in the commission of a crime of violence. A jury trial ensued, and on September 12, 2014, the jury acquitted appellant of murder in the first degree but failed to reach a verdict on the lesser included offense of murder in the second degree as well as the handgun charge. A mistrial was declared, and after three continuances, appellant was tried again, in April 2016. Following a three-day trial, the jury convicted him of murder in the second degree and use of a handgun in the commission of a crime of violence. Upon receiving a sentence of thirty years' imprisonment for second-degree murder and a consecutive sentence of twenty years' imprisonment for use of a handgun in the commission of a crime of violence, appellant noted this timely appeal.

Additional facts will be noted as pertinent to discussion of the issues.

## DISCUSSION

### I.

### A.

Appellant argues that his conviction for second-degree murder must be reversed because the circuit court erroneously instructed the jury that first-degree assault could serve as the underlying felony for second-degree felony murder, and it cannot be determined from the jury's general verdict whether it found that he had committed second-degree specific-intent murder or second-degree felony-murder. He then pivots to the conclusion that, because we must reverse his conviction for second-degree murder,

5

the only crime of violence for which he was convicted, we must also reverse his conviction for the use of a firearm in the commission of a crime of violence.

Appellant argues that the objection made by his trial counsel, prior to the trial court's instructions to the jury, adequately preserved this claim for appeal. In the alternative, he argues that we should address his claim for plain error because it is grounded upon a conviction for what he terms a "non-existent crime."

Appellant further argues that the court erred in giving a flight instruction, which, he maintains, was not generated under the facts of this case. Moreover, he asserts, because that purportedly unwarranted flight instruction "permitted the jury to infer guilt merely from the fact that" he left the scene, and the State's case otherwise rested "primarily" upon the testimony of two unreliable witnesses, that alleged instructional error was not harmless.

Appellant also argues that the trial court erred in denying his motion to dismiss on the ground of a speedy trial violation. According to appellant, the delay of eighteen months and twenty-two days in commencing his retrial was chargeable to the State, he "frequently and forcefully" asserted his speedy trial rights, and the lengthy pretrial incarceration to which he had been subjected caused him prejudice; the sum total of which, he contends, should have resulted in dismissal.

Finally, appellant argues that the trial court erred in admitting a computer aided dispatch ("CAD") report because that report contained inadmissible hearsay. To the extent that the court below ruled that the CAD report was offered for a non-hearsay

purpose, appellant argues that its probative value was substantially outweighed by its potential for unfair prejudice.

**B.**

The State concedes that appellant's second-degree murder conviction should be reversed (regardless of non-preservation) but otherwise disagrees with appellant. As for the conviction for use of a firearm in the commission of a crime of violence, the State argues that that conviction should stand. The State explains that although it may have been predicated upon a conviction for a crime of violence, second-degree felony murder, which cannot be sustained in light of *Jones*, the firearm conviction may nonetheless be sustained because the jury necessarily found that appellant had committed a crime of violence, either first-degree assault (the uncharged predicate felony) or second-degree specific-intent murder, and it is not required that the State charge the underlying crime of violence when charging illegal use of the firearm.[4]

With respect to the flight instruction, the State argues that there was testimony that appellant had left the dying victim at a fire department station house, in the back seat of a car, and then left before any of the firefighters could speak with him. Under those

---

[4] The State cites *Ford v. State*, 274 Md. 546, 551 (1975) (holding that "an individual on trial for the [firearm] charge does not necessarily need to have been separately accused of the commission of a felony or crime of violence in an additional count or indictment before he can be charged with or convicted of the crime established in [Criminal Law Article, § 4-204]"), *overruled on other grounds by Price v. State*, 405 Md. 10 (2008), for the latter proposition.

7

circumstances, which, according to the State, could support "a reasonable inference of consciousness of guilt," a flight instruction was appropriate.

With respect to the speedy trial claim, the State argues that the delays, though ultimately chargeable to the State, were neither negligent nor intentional, as they were primarily due to delays in procuring transcripts of the prior trial, as well as the necessity of bringing up to speed two new prosecutors who had taken over the case upon the resignation of their predecessors; consequently, the delays should not be weighed heavily against the State. As for prejudice, the State points out that appellant concedes, in his brief, that he has not suffered any "actual prejudice." Accordingly, the State concludes that dismissal was not warranted, and the trial court did not err in denying appellant's motion to dismiss.

Finally, with respect to the alleged error in admitting the CAD report, the State argues that the report was offered "to establish for narrative purposes why officers acted as they did in pursuing the investigation," as well as "to establish the timing of events." Moreover, according to the State, the CAD report "was not more prejudicial than probative," and even if it were inadmissible, any error by the trial court in admitting it was harmless.

## II.

We first address whether appellant's claims of instructional error were preserved and conclude that only the claim concerning the flight instruction was preserved. We then consider his claim of plain error concerning the instruction for second-degree felony murder, as well as the effect of that error on the conviction for use of a firearm in the

8

commission of a crime of violence.  Finally, we address the merits of appellant's preserved claim concerning the flight instruction.

## A. Preservation

After the close of all of the evidence, the parties discussed jury instructions. Regarding the instructions for second-degree murder, the following colloquy took place:

> [THE STATE]:  So, I believe the pattern instruction should be followed up into the point to convict the defendant of first degree assault.  It shouldn't say to convict[], but to prove the defendant committed first degree assault, the State must prove, one, that the defendant intentionally caused serious physical injury to Charles Thompson and that the injury was not consented to or legally justified.
>
> Or two, that the defendant used a firearm and -- I'm sorry.  As I had typed it up, or to use a firearm to intentionally frighten Charles Thompson with the threat of immediate physical harm.
>
> And all of that should be a subsequent paragraph to the first four, just as it's shown in the pattern.
>
> [DEFENSE COUNSEL]:  And again from my position, Your Honor, the first degree assault by means of use of a handgun is not a predicate offense for [second][5] degree felony murder.  That's why it's not in the pattern.
>
> That's why the pattern requires the other kind of first degree assault, the one that is an intentional causing of serious physical injury.

---

[5] The transcript states "first degree felony murder," but the context makes it clear that the parties were discussing the instruction for second-degree felony murder.  Indeed, appellant could not have been tried for first-degree murder at the 2016 trial, because he had already been acquitted of that offense in the 2014 trial.

So that's why we're objecting to using the instruction the State is now requesting.

[THE STATE]: If the Court wants to leave it as is that's fine. I think then that the only thing that needs to change is the language to convict the defendant of first degree assault. It should say to prove the defendant committed first degree assault since first degree assault.

The court then engaged in an extended discussion with the prosecutor to clarify that she was not requesting a separate instruction for first-degree assault, because the pattern instruction for second-degree felony murder[6] contained an adequate instruction for first-degree assault. Thereafter, the court gave jury instructions for both second-degree specific-intent murder and second-degree felony murder, the latter substantially similar to Maryland Criminal Pattern Jury Instruction ("MPJI-Cr") 4:17.7.2 (Maryland State Bar Association 2012)[7]:

---

[6] The pattern instruction at issue was Part A of Maryland Criminal Pattern Jury Instruction ("MPJI-Cr") 4:17.7.2 ("Homicide -- Second Degree Felony Murder (Inherently Dangerous Nature of Felony: First Degree Assault, and Inherently Dangerous Manner in which Felony was Perpetrated)") (Maryland State Bar Association 2012). In mid-2017, Part A was deleted as "Abrogated by *State v. Jones*, decided by the Court of Appeals on February 24, 2017."

[7] MPJI-Cr 4:17.7.2, Part A stated in pertinent part:

SECOND DEGREE FELONY MURDER -- INHERENTLY DANGEROUS NATURE OF FELONY: FIRST DEGREE ASSAULT

The defendant is charged with the crime of second degree felony murder. Felony murder does not require the State to prove that the defendant intended to kill the person who was killed. In order to convict the defendant of second degree felony murder, the State must prove:

(continued)

10

All right, so, the defendant is charged with second degree murder. Second degree murder is the killing of another person with either the intent to kill or the intent to inflict such serious bodily harm that death would be the likely result.

Second degree murder does not require premeditation or deliberation.

In order to convict the defendant of second degree murder, the State must prove that the defendant caused the death of Charles Thompson and that the defendant engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result.

_____

(continued)

(1) that [the defendant] [another participating in the crime with the defendant] committed the crime of first degree assault;

(2) that [the defendant] [another participating in the crime] killed (name); and

(3) that the act resulting in the death of (name) occurred during the first degree assault.

To convict the defendant of first degree assault, the State must prove:

(1) that the defendant intentionally caused serious physical injury to (name); and

(2) that the injury was not [consented to by (name)] [legally justified].

For second degree felony murder, serious physical injury means injury that creates a substantial and foreseeable risk of death.

11

Second degree murder is also second degree felony murder, which does not require the State to prove that the defendant intended to kill the person who was killed.

In order to convict the defendant of second degree felony murder, the State must prove that the defendant committed the crime of first degree assault, that the defendant killed Charles Thompson, and that the act resulting in the death of Charles Thompson occurred during the first degree assault.

First degree assault requires the State to prove that the defendant intentionally caused serious physical injury to Charles Thompson and that the injury was not legally justified.

For second degree felony murder, serious physical injury means injury that creates a substantial and foreseeable risk of death.

The defendant is also charged with the crime of use of handgun in the commission of a crime of violence. The crime of violence in this case is second degree murder.

In order to convict the defendant, the State must prove that the defendant committed the crime of violence of second degree murder and that the defendant used a firearm or handgun in the commission of the crime of violence of second degree murder.

Upon the conclusion of the jury instructions, the court convened a bench conference, where the following exchange took place:

THE COURT: Satisfied with the jury instructions?

[DEFENSE COUNSEL]: Yes.

[THE STATE]: Yes, Your Honor.

12

[DEFENSE COUNSEL]: As I noted, Your Honor, I object to the flight instruction. I don't think it's been raised by the evidence in this case.

THE COURT: Okay, thank you.

Claims of instructional error are governed by Maryland Rule 4-325, which states in pertinent part:

> **(e) Objection.** No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

With respect to the second-degree felony murder instruction, trial counsel plainly did not object "promptly after the court instruct[ed] the jury," on the ground now raised in this appeal. Although, "if certain conditions are met, substantial compliance with Rule 4-325(e) may be sufficient to preserve arguments for appellate review even if the party fails to renew the objection on the record after the jury has been instructed," *Horton v. State*, 226 Md. App. 382, 413-14 (2016) (citing *Gore v. State*, 309 Md. 203, 209 (1987)), those conditions have not been met here. Among those conditions are that "the objection must be accompanied by a definite statement of the ground for objection unless the ground for objection is apparent from the record," and "the circumstances must be such that a renewal of the objection after the court instructs the jury would be futile or useless." *Gore*, 309 Md. at 209.

13

To understand the ground for objection raised below, it is helpful to examine the "Notes on Use" appended to MPJI-Cr 4:17.7.2. That note states in pertinent part:

> Use Part A of this instruction if the defendant is charged with second degree felony murder and the predicate felony is first degree assault under Md. Code Ann., Crim. Law I § 3-202(a)(1) (2012).

The first-degree assault statute, Criminal Law Article ("CL"), § 3-202, is a multi-purpose criminal statute. There are two distinct ways in which a person may commit a first-degree assault: by "intentionally caus[ing] or attempt[ing] to cause serious physical injury to another," CL § 3-202(a)(1); or by "commit[ting] an assault with a firearm." CL § 3-202(a)(2). In *Roary v. State, supra,* 385 Md. 217, upon which MPJI-Cr 4:17.7.2A is based, the first-degree assault at issue was the intent-to-cause-serious-physical-injury variety, *Roary,* 385 Md. at 230,[8] and that case did not expressly consider whether the other type of first-degree assault, involving the use of a firearm, could serve as a predicate felony for second-degree felony murder. Nor, for that matter, did MPJI-Cr 4:17.7.2 expressly address whether first-degree assault, involving the use of a firearm, may serve as a predicate felony for second-degree felony murder.

When the prosecutor requested that the court modify the pattern instruction to include an instruction that first-degree assault, involving the use of a firearm, could also serve as a predicate felony for second-degree felony murder, appellant's trial counsel

---

[8] Roary was one of four assailants who had "dropp[ed] a 20-30 pound boulder repeatedly on the victim's head." *Roary,* 385 Md. at 230.

14

noted an objection. Trial counsel made it clear that his objection was based upon the proposed deviation from the pattern instruction. Thereafter, the court adhered to the pattern instruction. Finally, when appellant's trial counsel entered an objection to the instructions as given, the only objection made was to the flight instruction, not to the second-degree felony murder instruction. Indeed, trial counsel had no basis to renew his previous objection to the second-degree felony murder instruction, because the court had acceded to his wishes. Under these circumstances, appellant's present claim, that the court should not have instructed the jury, in accordance with the pattern instruction, that intent-to-cause-serious-physical-injury first-degree assault is a valid predicate felony for second-degree felony murder, was not preserved.

### B. Felony Murder Instruction

In overruling *Roary*, the Court of Appeals advised: "The rule of law we announce today in this case regarding the use of willful injury as a predicate felony for felony-murder purposes shall be prospective only and **applicable to this case and those cases not resolved finally on direct appeal**." *Jones*, 451 Md. at 696 (emphasis added). Whether that represents a departure from ordinary principles of the prospective application of appellate decisions that change the common law is unclear. By way of comparison, in *Price v. State*, 405 Md. 10 (2008), which announced a new common-law rule disallowing inconsistent verdicts in criminal jury trials, the Court stated: "Accordingly, with regard to the instant case, **similarly situated cases on direct appeal where the issue was preserved**, and verdicts in criminal jury trials rendered after the date of our opinion in this case, inconsistent verdicts shall no longer be allowed." *Id.* at

15

29 (emphasis added). *Accord Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 469-70 (1992) (discussing the effective date of changes in the common law). Assuming that *Jones* did not depart from ordinary principles governing the prospective-versus-retroactive application of appellate decisions that change the common law, we shall review appellant's claim for plain error. Md. Rule 4-325(e).

In *Newton v. State*, 455 Md. 341 (2017), the Court of Appeals set forth the following framework for that analysis:

> Plain error review is reserved for those errors that are compelling, extraordinary, exceptional or fundamental to assure the defendant of a fair trial. Before we can exercise our discretion to find plain error, four conditions must be met: (1) there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant; (2) the legal error must be clear or obvious, rather than subject to reasonable dispute; (3) the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the [trial] court proceedings; and (4) the error must seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings.

*Id.* at 364 (citations and quotations omitted).

Ordinarily, for an error to be "plain," it must have been plain at the time of trial. *James v. State*, 191 Md. App. 233, 247 (2010) (observing that an "error would not be 'plain' unless it is wrong under current law") (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). The Supreme Court, however, has recognized an exception to that rule where, as here, "the law at the time of trial was settled and clearly contrary to the law at the time of appeal," in which case "it is enough that an error be 'plain' at the time of

16

appellate consideration." *Johnson v. United States*, 520 U.S. 461, 468 (1997). The Court reasoned that were the rule otherwise, defense counsel would be obligated to "inevitably [make] a long and virtually useless laundry list of objections to rulings that were plainly supported by precedent." *Id.*

Applying *Johnson*, we conclude that the felony murder jury instruction in this case amounted to plain error, although, in arriving at that conclusion, we certainly do not fault the trial judge, who was merely (and correctly) following what was, at the time of appellant's trial, settled Maryland law. Similarly, we do not fault trial counsel, who could not reasonably have been expected to object to the judge's decision to give the pattern instruction. *See, e.g., Yates v. State*, 202 Md. App. 700, 724 (2011) (recognizing that, when the law did not change during the pendency of appeal, the "use of a pattern jury instruction, without objection, weighs heavily against plain error review of the instructions given"). In any event, it is undisputed that the error affected appellant's substantial rights, as it created the distinct possibility that he was convicted of, in his words, a "non-existent crime," given that, on the record before us, we cannot determine whether the jury found appellant guilty of second-degree specific-intent murder or second-degree felony murder. Thus, we conclude that the error seriously affected the fairness, integrity or public reputation of judicial proceedings. We acknowledge that our recognition of plain error is extraordinary. We do so only after a careful consideration of substantial rights. *See Garner v. State,* 183 Md. App. 122, 152 (2008), *aff'd* 414 Md. 372 (2010) ("One must remember, however, that a consideration of plain error is like a trip to Angkor Wat or Easter Island. It is not a casual stroll down the block to the drugstore or

17

the 7-11.")  Accordingly, we exercise our discretion and reverse appellant's conviction for second-degree murder.  Upon remand, the State is free to retry him for second-degree specific-intent murder.

### C.  Use of a Firearm in the Commission of a Crime of Violence

We next address whether we should affirm appellant's conviction for use of a firearm in the commission of a crime of violence, notwithstanding that we are reversing his conviction for the underlying crime of violence, second-degree murder.  The Court of Appeals, in *State v. Hawkins*, 326 Md. 270 (1992), examined the problem we face here:

> Under the law of this State, where there is a conviction for only one offense and an erroneous instruction on that offense, the judgment is ordinarily vacated and the case remanded for a new trial.  However, where there are multiple offenses involved, as is the case here, the remedy for an error in the instructions on one of the offenses depends upon the degree to which the erroneous instruction taints each individual conviction.

*Id.* at 290-91 (citations omitted).  Thus, we must determine "the degree to which the erroneous instruction" for second-degree felony murder "taint[ed]" appellant's conviction for use of a firearm in the commission of a crime of violence.

Use of a firearm in the commission of a felony or crime of violence is a statutory offense, defined by CL § 4-204, which provides in pertinent part:

> (b) A person may not use a firearm in the commission of a crime of violence, as defined in § 5-101 of the Public Safety Article, or any felony, whether the firearm is operable or inoperable at the time of the crime.

The elements of that offense are (1) that a firearm was used by the defendant, and (2) that he used it in the commission of a felony or crime of violence. *Hoffert v. State*, 319 Md. 377, 379-80 (1990).[9]

The latter element is actually a compound element, comprising a "definite, ascertainable and limited" number of felonies, as well as those misdemeanors constituting crimes of violence under Public Safety Article ("PS"), § 5-101. *State v. Ferrell*, 313 Md. 291, 300 (1988). Thus, CL § 4-204 is a multi-purpose criminal statute, "embracing different matters in the disjunctive," and a court, in applying the required evidence test, "must examine the alternative elements relevant to the case at hand." *Id.* at 298 (citation and quotation omitted). What that means for our purposes is that we must select the alternative element that was actually included in the jury instruction for the firearm

---

[9] The statute criminalizing use of a firearm in the commission of a crime of violence was first enacted in 1972 and provided:

> Any person who shall use a handgun in the commission of any felony or any crime of violence as defined in Section 441 of this Article, shall be guilty of a separate misdemeanor and on conviction thereof shall, in addition to any other sentence imposed by virtue of commission of said felony or misdemeanor, be sentenced to the Maryland Division of Correction for a term of not less than five nor more than fifteen years, and it is mandatory upon the court to impose no less than the minimum sentence of five years.

1972 Md. Laws, ch. 13, § 3, at 43 (codified at Art. 27, § 36B(d)). In 2011, the General Assembly expanded the scope of that statute (actually, its successor, Criminal Law Article ("CL"), § 4-204) to include not only handguns but firearms. 2011 Md. Laws, chs. 164, 165. Obviously, decisions rendered before that date, such as *Hoffert*, refer to the use of a handgun, rather than a firearm, as constituting an element of the offense now delineated in CL § 4-204.

offense—in this case, murder in the second degree. Thus, in the context of this case, the elements of the firearm offense were (1) that appellant used a firearm, and (2) that he used it in the commission of a murder in the second degree.[10]

As the State points out, the firearm offense "is separate and distinct from the felony or crime of violence during the commission of which the [firearm] was used," and, therefore, "an individual on trial for the [firearm] charge does not necessarily need to have been separately accused of the commission of a felony or crime of violence in an additional count or indictment before he can be charged with or convicted of the crime established in [CL § 4-204]." *Ford v. State*, 274 Md. 546, 551 (1975), *overruled on other grounds by Price v. State*, 405 Md. 10 (2008). *Accord Kohler v. State*, 203 Md. App. 110, 119 (2012) (observing that it is not necessary "for the State to separately charge the defendant with the predicate felony" when charging felony murder) (citation omitted).

As the State further points out, the element undermined by our holding in this case, that the defendant used the firearm in the commission of a felony or crime of violence, was, arguably, found by the jury[11]: The general verdict, maintains the State, leaves only two possibilities for inferring what the jury necessarily found as to the

---

[10] In this respect, the "relationship between the underlying felony or crime of violence and the [firearm] offense under [CL § 4-204] is similar to the relationship between the underlying felony and the offense of felony murder." *State v. Ferrell*, 313 Md. 291, 300 (1988).

[11] Although neither side mentions it, we note that the jury's finding that appellant had used a firearm is not undermined by our vacatur of the conviction for the underlying felony or crime of violence. Thus, we focus our attention on the second element of the firearm offense, the predicate felony or crime of violence.

20

disputed element of the firearm offense; the jury either found appellant guilty of second-degree specific-intent murder, or it found him guilty of second-degree felony murder. If it was the former, then it is obvious that the jury found the necessary part of the missing element, because second-degree specific-intent murder is both a felony and a crime of violence. But if it was the latter, then the jury necessarily found that appellant had committed a first-degree assault, as that was the only predicate felony on which the jury had been instructed as to felony murder, and first-degree assault is also both a felony and a crime of violence.

Although the State's argument has superficial appeal, the difficulty is that it ignores that appellant was never actually charged with first-degree assault and, therefore, was not and could not have been convicted of that offense. Indeed, upon vacatur of appellant's conviction for second-degree murder, he does not stand convicted of a predicate felony or crime of violence. In fact, the jury was instructed that, "[i]n order to convict [appellant]," the State was required to "prove that [he] committed the crime of violence of second degree murder and that [he] used a firearm or handgun in the commission of the crime of violence of second degree murder." Accordingly, given that we are reversing appellant's conviction for second-degree murder, we shall also reverse his conviction for use of a firearm in the commission of a felony or crime of violence, a charge for which he may be re-tried upon remand. *See*, *e.g.*, *Newton v. State*, 280 Md. 260, 274 (1977) (where the defendant had been convicted of two felonies and two use-of-handgun charges, and one of the felony convictions was vacated on grounds of merger, the Court also vacated one of the handgun convictions, reasoning that, as "only

21

one felony has been committed, there can be only one judgment of conviction of use of a handgun in the commission of a crime of violence"); *Williams v. State*, 117 Md. App. 55, 69-71 (where the defendant had been convicted of assault with intent to maim and use of a handgun in the commission of a felony or crime of violence, and the assault conviction was vacated because of an instructional error, the Court also vacated the use-of-handgun conviction), *appeal dismissed*, 347 Md. 253 (1997). *See also Nottingham v. State*, 227 Md. App. 592, 612 (2016) (where the defendant had been convicted of misdemeanor manslaughter and three separate predicate offenses, and one of the predicate convictions was reversed because of an instructional error, the Court affirmed the manslaughter conviction, because the jury had convicted the defendant of two other valid predicate offenses, which were unaffected by the instructional error).

## D. Flight Instruction

We turn next to appellant's preserved claim that the circuit court abused its discretion in giving a flight instruction. Under "appropriate circumstances where the evidence supports an inference of consciousness of guilt," a trial court may give a flight instruction to a jury in a criminal case. *Thompson v. State*, 393 Md. 291, 305 & n.2 (2006). We review a trial court's decision whether to give a flight instruction for abuse of discretion. *Id.* at 311 (citations omitted).

The Court of Appeals has adopted the four-prong test from *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977), in assessing whether a flight instruction is appropriate under the circumstances of a given case. *Thompson*, 393 Md. at 311 (citing *Thomas v. State*, 372 Md. 342 (2002)). A flight instruction is permissible only if "the

following four inferences" may reasonably be drawn "from the facts of the case as ultimately tried":

> (1) "that the behavior of the defendant suggests flight";
> (2) "that the flight suggests a consciousness of guilt";
> (3) "that the consciousness of guilt is related to the crime charged or a closely related crime"; and
> (4) "that the consciousness of guilt of the crime charged suggests actual guilt of the crime charged or a closely related crime."

*Id.* at 312.

Appellant focuses his appellate challenge on the first inference, asserting that the evidence failed to show that he had fled, "either from the scene of the shooting or from the fire station." In *Hoerauf v. State*, 178 Md. App. 292 (2008), we drew a distinction between "flight" and "departure." "[E]vidence of flight is defined by two factors: first, that the defendant has moved from one location to another [*i.e.*, "departure"]; second, some additional proof to suggest that this movement is not simply normal human locomotion." *Id.* at 323 (citation omitted). Thus, "an accused's departure from the scene of a crime, without any attendant circumstances that reasonably justify an inference that the leaving was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt, does not constitute 'flight,' and thus does not warrant the giving of a flight instruction." *Id.* at 325-26.

Here, Richard Peterson, one of the volunteer firefighters who rendered aid to Thompson at the Ritchie fire station, testified that, "just after midnight" on February 8, 2013, he was awakened by a ringing doorbell, and when he answered the door, he encountered a "black male," matching the physical appearance of appellant. Appellant,

according to Peterson, was "saying that there was somebody who needed our help" but "wouldn't elaborate on what exactly was wrong." Peterson walked over to the fire truck, grabbed a flashlight and jacket and, accompanied by another firefighter, walked to the parking lot alongside the fire station, where he discovered Thompson's car, with its engine running and its headlights on, and all of its doors closed. By that time, according to Peterson, appellant was already across the street at a nearby 7-Eleven, having "made incredibly good time making his way down that way." Peterson and the other firefighters then turned their attention to the car, where they found the victim, slumped in the rear, "suffering from a gunshot wound to the left temple." Appellant never returned to the scene.

Not only did Peterson testify that appellant "made incredibly good time" in leaving the scene, but the circumstances "reasonably justif[ied] an inference" that appellant left the scene "with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt." *Hoerauf*, 178 Md. App. at 325. Among those circumstances were that appellant never identified himself to the firefighters, he did not lead them to the vehicle where his injured companion lay, and he did not remain at the scene to find out whether his companion would survive his injuries. We conclude that the circuit court did not abuse its discretion in giving a flight instruction.

## III.

We turn next to appellant's claim that he was denied his right to a speedy trial because of the eighteen-month-twenty-two-day delay that preceded his retrial. Although,

24

as we shall explain, that delay was lengthy enough to trigger a constitutional analysis, his right to a speedy trial was not violated.

The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees a criminal defendant the right to a speedy trial, and Article 21 of the Maryland Declaration of Rights contains a similar guarantee. *Nottingham*, *supra*, 227 Md. App. at 613 (citing *State v. Kanneh*, 403 Md. 678, 687 (2008)). In reviewing a circuit court's denial of a motion to dismiss on the ground of a speedy trial violation, we accept its findings of fact unless clearly erroneous but "perform a *de novo* constitutional appraisal in light of the particular facts of the case at hand." *Glover v. State*, 368 Md. 211, 221 (2002).

In addressing a speedy trial claim, we apply the four-factor balancing test articulated by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972), "in which the conduct of both the prosecution and the defendant are weighed." *Kanneh*, 403 Md. at 687-88 (quoting *Barker*, 407 U.S. at 530). Those factors are: (1) the "[l]ength of delay"; (2) the "reason for the delay"; the "defendant's assertion of" his speedy trial right; and (4) "prejudice to the defendant." *Barker*, 407 U.S. at 530. "None of these factors is, in itself, either necessary or sufficient to find a violation of the speedy trial right; instead, 'they are related factors and must be considered together with such other circumstances as may be relevant.'" *Nottingham*, 227 Md. App. at 613 (quoting *Barker*, 407 U.S. at 533).

### A. Length of Delay

Unless "there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at

25

530. Thus, the first factor, the length of delay, plays a dual role, "because a delay of sufficient length is first required to trigger a speedy trial analysis, and the length of the delay is then considered as one of the factors within that analysis." *Kanneh*, 403 Md. at 688.

In a case, as here, in which there was a retrial following the declaration of a mistrial, the starting point for computing the length of delay begins at the time when the mistrial was declared, and the relevant time period runs until the commencement of the retrial.[12] *Icgoren v. State*, 103 Md. App. 407, 420, *cert. denied*, 339 Md. 167 (1995). Here, that delay was eighteen months and twenty-two days, which is sufficient to trigger a constitutional analysis. *See, e.g.*, *Doggett v. United States*, 505 U.S. 647, 652 n. 1 (1992) (observing that, generally, a delay triggers a speedy trial analysis "at least as it approaches one year"); *Divver v. State*, 356 Md. 379, 389-90 (1999) (observing that a delay as short as eight months could trigger a constitutional speedy trial analysis); *Icgoren*, 103 Md. App. at 423 (concluding that a delay of eleven months and thirteen days was "barely" of constitutional dimension).

### B. Reasons for the Delay

The *Barker* Court set out the framework for assessing responsibility for the various pretrial delays in a case involving a speedy trial claim:

> Closely related to length of delay is the reason the
> government assigns to justify the delay. Here, too, different

---

[12] There is an exception to that rule if, prior to retrial, the prosecution enters a *nolle prosequi* to the original charging document and files new charges, *State v. Henson*, 335 Md. 326, 336-38 (1994), but that exception does not apply here.

26

weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531 (footnote omitted).

We begin with the relevant timeline:

September 12, 2014:    Mistrial declared. Retrial scheduled March 23, 2015.

March 3, 2015:    State files first motion for continuance. Appellant consents. Motion granted. Retrial scheduled June 15, 2015.

June 1, 2015:    State files second motion for continuance. Appellant opposes. Motion granted. Retrial scheduled December 7, 2015.

November 17, 2015:    State files third motion for continuance. Appellant opposes. Motion granted. Retrial scheduled April 4, 2016.

March 31, 2016:    Appellant moves to dismiss the charges because of a speedy trial violation. Motion denied.

The period of delay, from September 12, 2014 until March 23, 2015, is accorded essentially no weight in the analysis, as that is the time it would have taken for trial preparation in the absence of any of the ensuing postponements. *See, e.g., Ratchford v. State,* 141 Md. App. 354, 361 (2001) (concluding that the initial six-month-eleven-day period of delay in a murder trial, from arrest to the first scheduled trial date, "was necessary for the orderly administration of justice and is not considered an unreasonable delay that calls for further accounting"), *cert. denied,* 368 Md. 241 (2002); *Howell v.*

27

*State*, 87 Md. App. 57, 82 (observing that the "span of time from charging to the first scheduled trial date is necessary for the orderly administration of justice, and is accorded neutral status"), *cert. denied*, 324 Md. 324 (1991).  The period of delay, from March 23, 2015 until June 15, 2015, is chargeable to the State, the party that requested the postponement.  The reasons it gave were that, after the March 23rd trial date had been scheduled, the Assistant State's Attorney originally assigned to the trial had resigned and that his replacement needed additional time to prepare for the case, including the procurement of the transcripts from the previous trial.  In any event, appellant's trial counsel consented to the delay. Accordingly, this period of delay weighs only slightly against the State.

The period of delay, from June 15, 2015 until December 7, 2015, is chargeable to the State, the party that requested the postponement.  The reasons it gave were that, after the first postponement had been granted and the June 15th trial date scheduled, the Assistant State's Attorney had resigned, his replacement needed additional time to prepare for the case,  and the Court Reporter's Office had notified the State that the transcripts from the previous trial would not yet be available in time for the June 15th trial.  Although these reasons may suggest a lack of diligence by the State, they do not rise to the level of a "deliberate attempt to delay the trial in order to hamper the defense," but rather, are akin to "more neutral reason[s] such as negligence or overcrowded courts." *Barker*, 407 U.S. at 531.  Accordingly, this period of delay weighs slightly against the State.

The period of delay, from December 7, 2015 until April 4, 2016, is chargeable to the State, the party that requested the postponement. We may only infer the State's reasons for the third postponement, as its motion does not appear in the record; however, appellant's motion in opposition does appear[13] and makes clear that the State requested the third postponement because the transcripts from the original trial had still not been provided. Once again, and similar to the second period of delay, this period weighs slightly against the State.

In sum, the total period of delay chargeable to the State (aside from the originally scheduled period from September 12, 2014 until March 23, 2015, which is accorded essentially no weight in the analysis because it comprises the ordinary time required to prepare for trial), was one year and eleven days, and all of that delay weighs slightly, because none of it evinced a "deliberate attempt to delay the trial in order to hamper the defense." *Barker*, 407 U.S. at 531.

### C. Defendant's Assertion of the Right

"The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right," and a "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 531-32. In the instant case, appellant first asserted his speedy trial right when the State filed its second motion for a continuance.

---

[13] It appears that the circuit court granted the State's third motion for continuance without affording the defense an opportunity to respond. Appellant subsequently filed a motion for reconsideration, from which we may infer the substance of the State's motion. The circuit court thereafter denied appellant's motion for reconsideration.

Apparently, appellant's trial counsel verbally protested to the prosecutor prior to the filing of the State's motion, in which the prosecutor stated that "counsel for the defendant[] objects to this continuance." Appellant's trial counsel made a more vehement assertion of his speedy trial right when the State filed its third motion for a continuance, filing a motion for reconsideration of the circuit court's grant of that motion. Finally, he filed a pretrial motion to dismiss for a purported speedy trial violation, which was denied. Under all of the circumstances, we conclude that this factor weighs slightly in favor of appellant. *See, e.g., Jules v. State*, 171 Md. App. 458, 486 (2006) (concluding that, where "the frequency of the demands" to be brought to trial were "not extraordinary," this factor "weighs lightly in favor of dismissal"), *cert. denied*, 396 Md. 525 (2007).

### D. Prejudice

Prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker*, 407 U.S. at 532. Those interests are:

> (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.

*Id.* The "most serious" of those three is "the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

Appellant focuses exclusively on the first two of those interests, oppressive pretrial incarceration (in his case, two years and nine months) and its attendant anxiety and concern. He does not, however, point to any specific instance of impairment to his defense.

30

Oppressive pretrial incarceration with its attendant anxiety and concern to the accused is generally afforded only slight weight. *See, e.g., Fields*, 172 Md. App. at 541-44 (assigning only slight weight to the defendants' pretrial incarceration); *Wilson v. State*, 148 Md. App. 601, 639 (2002) ("accord[ing] great weight to the lack of any significant prejudice resulting from the delay," where the only prejudice was the defendants' pretrial incarceration), *cert. denied*, 374 Md. 82 (2003), *cert. denied*, 374 Md. 83 (2003), *cert. denied*, 374 Md. 84 (2003).

### E. Balancing of the Factors

Having determined that the eighteen-month-twenty-two-day delay between the mistrial and the retrial was of constitutional dimension, we note that, nonetheless, there are cases in which delays of this length or even greater were held not to have resulted in a violation of the right to a speedy trial. *See, e.g., Barker*, 407 U.S. at 533-36 (greater than five-year delay held not to result in speedy trial violation); *Kanneh*, 403 Md. at (thirty-five-month delay held not to result in speedy trial violation); *Butler v. State*, 214 Md. App. 635, 664 (2013) (twenty-seven-month delay held not to result in speedy trial violation), *overruled on other grounds by Nalls v. State*, 437 Md. 674 (2014); *Fields*, 172 Md. App. at 549-50 (twenty-month delay held not to result in speedy trial violation); *Wilson*, 148 Md. App. at 640 (eighteen-month delay held not to result in speedy trial violation); *Ratchford*, 141 Md. App. at 363 (eighteen-month delay held not to result in speedy trial violation).

The Court of Appeals has explained that "the delay that can be tolerated is dependent, at least to some degree, on the crime for which the defendant has been

31

indicted." *Glover*, 368 Md. at 224 (citing *Barker*, 407 U.S. at 531). Thus, a twelve-month-sixteen-day delay was held to result in a constitutional violation in "a relatively run-of-the-mill District Court case," where the charges were driving under the influence of alcohol and running a red light, and the trial of the case "presented little, if any, complexity." *Divver v. State*, 356 Md. 379, 390 (1999). In contrast, a twenty-month delay was permitted in a relatively complex murder case, despite "unacceptable reasons" for that delay. *Fields*, 172 Md. App. at 550. Here, in a murder case, we deem the eighteen-month-twenty-two-day delay to be "not a weighty factor, one way or the other." *Ratchford*, 141 Md. App. at 360.

Moreover, although appellant asserted his speedy trial right, he did not do so until the second continuance, by which time there had already been an eight-and-one-half-month delay. Although this factor weighs in favor of appellant, it has only slight weight. And, as we have previously pointed out, although all of the delays were the fault of the State, there was no "deliberate attempt to delay the trial in order to hamper the defense," *Barker*, 407 U.S. at 531, or even grossly negligent conduct by the State, and none of the delays weighs heavily.

Finally, the prejudice that accrued to appellant does not weigh in his favor. Appellant has not demonstrated that his defense was impaired through, for example, the death of a critical witness or the ensuing unavailability of crucial evidence. Where, as here, the only prejudice claimed is the lengthy pretrial incarceration with its attendant anxiety and concern, the balance of factors weighs against appellant. *See Wilson*, 148 Md. App. at 639 ("accord[ing] great weight to the lack of any significant prejudice

32

resulting from the delay"). Having weighed all of the relevant factors, we conclude that appellant was not denied his constitutional right to a speedy trial.

## IV.

Given our disposition of this appeal and because this issue is likely to recur upon remand, we shall briefly address appellant's claim that the trial court erroneously admitted a CAD report, which contained inadmissible hearsay.

## A.

The disputed evidence was introduced through the testimony of Sergeant William Silvers, of the Prince George's County Police Department, who had responded to a report of an "unconscious subject on the side of the Ritchie Road firehouse" in the early morning of February 8, 2013. After the victim was transported to the hospital and the crime scene was secured, but without yet having identified the person (appellant) who had left the victim at the firehouse, Sergeant Silvers went home for the evening, because his "shift ended at 1:30 [a.m.]" Later, after arriving at home, Sergeant Silvers recalled that, earlier that evening, he had heard a dispatched call regarding "shots fired" in a nearby residential area, and he called an acquaintance, who was a homicide detective, and informed him of that earlier call, telling him that he "may want to look at that call."

Following that testimony, the prosecutor introduced State's Exhibit 82 and asked Sergeant Silvers whether he recognized it. He responded that it was a collection of CAD reports for a 911 call regarding gunshots fired in the 2600 block of Timbercrest Drive,

near appellant's home,[14] as well as the police and fire responses to the discovery of the victim's body at the Ritchie firehouse. Sergeant Silvers explained that, when a call is received by a 911 operator, the operator sends it to "the proper channel, at which time the dispatcher will dispatch the call to the proper district and sector." The resulting CAD report records, among other things, the precise time when a call is received, when it is dispatched, the encoded identities of the emergency responders, the times when they arrived and departed, and the location to which they responded. Furthermore, it contains one or more summaries of statements made by the 911 caller to the dispatcher, which the dispatcher then relays to the responders.

The summaries in question are contained in the CAD report concerning the complaint of gunshots fired. They state:

> SHOTS FIRED (heard only) (Gun). 1. The caller is on the scene, but is not the victim/suspect (2nd party). 2. This incident just occurred. 3. This is not a referral call. 4. A gun is involved. 5. The location of the weapons is not known. 6. Shots have been fired. 7. The caller didn't see the person who fired the shots.
>
> * * *
>
> 8. The suspect/person responsible is on the scene. 9. The suspect's description is: 10. The suspect arrived in a vehicle. 11. The vehicle description is: 12. The location of the vehicle is: PULLED OUT AND GONE 13. There is no one in immediate danger. 14. No one is reportedly injured or sick.-Comments: PULLED OUT AND GONE
>
> * * *

---

[14] Appellant lived at 2508 Timbercrest Drive.

34

CALLER ADV HEARING A SINGLE GUNSHOT AT LOI AND THERE ARE STILL SEVERAL B/M'S AT THE SCENE / NO ONE RUNNING. NO SOUNDS OF FLEEING VEHICLES BUT CALLER THOUGHT IT WAS A GUNSHOT / NFI

After Sergeant Silvers concluded his description of the reports and his explanation of how to interpret the encoded data therein, the State offered State's Exhibit 82 into evidence, and appellant's trial counsel raised a hearsay objection, asking that the court redact the summaries. The circuit court deferred ruling on the objection until the following day, when it determined that the CAD reports were being offered for a non-hearsay purpose, namely, "to show what the officer[s] responded to and what they perhaps would be looking for when they got to the scene." The court overruled appellant's objection and admitted the CAD reports, including the report of gunshots fired, in their entirety. Appellant's trial counsel then made the additional objection that the CAD reports were "not relevant, not material, and more probative than prejudicial," and the court also overruled that objection.

**B.**

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801. "Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." Md. Rule 5-802. Because a circuit court has no discretion to admit hearsay in the absence of an exception to Rule 5-802, appellate review of whether evidence is hearsay and, if so, whether it falls

35

within an exception and is therefore admissible, is *de novo*. *Dulyx v. State*, 425 Md. 273, 285 (2012) (citations omitted).

According to the circuit court (and the State), the CAD report summaries in dispute were offered for the non-hearsay purpose of their effect on the responding officers. As the State points out, the disputed summaries provide little detail and do not provide the names of anyone, whether witness, victim, or suspect.

Our analysis is guided by two decisions of this Court, which illustrate the legitimate and illegitimate admission of evidence for a non-hearsay purpose: *Frobouck v. State*, 212 Md. App. 262, *cert. denied*, 434 Md. 313 (2013), and *Zemo v. State*, 101 Md. App. 303 (1994).

In *Frobouck*, during a jury trial on a charge of manufacturing marijuana, a deputy sheriff, who had been dispatched to the defendant's leased premises after the landlord discovered a suspected marijuana growing operation, was asked why he responded to that location and replied that he had been "dispatched there for a suspected marijuana grow." *Id.* at 281. The defense raised a hearsay objection, which the circuit court overruled, on the ground that the deputy's statement was offered for a non-hearsay purpose, as "a statement or assertion that the deputy received to take some further action." *Id.*

On appeal, we affirmed. We reasoned that the deputy's disputed statement was "not offered to prove the truth of the matter asserted—that there was a 'marijuana grow'—but, rather, to explain *briefly* what brought the officers to the scene in the first place." *Id.* at 283. We contrasted the circumstances in that case with those in *Zemo*.

36

During Zemo's jury trial on a charge of breaking and entering and related offenses, the lead detective in the case was permitted, in the Court's words, to testify, over objection,

> that he received evidence about the crime from a confidential informant, that the informant's information put him on the trail of [Zemo] and other suspects, that other parts of the informant's information were corroborated and turned out to be correct, and that, acting on the informant's information, he arrested [Zemo].

*Id.* at 306.

We rejected the State's contention that the detective's testimony had been offered for a non-hearsay purpose, to explain "why [the detective] went where he went" and "to lay out the course of the investigation[.]" *Id.* at 309-10. We held that the "only possible import of such testimony was to convey the message that the confidential informant 1) knew who committed the crime, 2) was credible, and 3) implicated [Zemo]" and that purporting to admit that testimony for a non-hearsay purpose violated both the Confrontation Clause and the rule against hearsay. *Id.* at 306. We further emphasized that we were "not counseling an overreaction to every passing or random interjection of some arguably prejudicial material into a trial," but rather, we were "objecting to . . . a sustained and deliberate line of inquiry that can have had no other purpose than to put before the jury an entire body of information that was none of the jury's business." *Id.*

We think the instant case is more like *Frobouck* than *Zemo*. Here, unlike in *Zemo*, the disputed statements in the CAD report were simply not part of "a sustained and deliberate line of inquiry" for an illegitimate purpose. *Id.* Although the statements amounted to, perhaps, somewhat more than a "brief[]" explanation of "what brought the

37

officers to the scene in the first place," *Frobouck*, 212 Md. App. at 283, their import was similarly benign. Moreover, they were cumulative to testimony of police officers that there had, in fact, been a contemporaneous report of gunshots fired on the block where Appellant lived. And, given that the disputed statements did not identify the shooter or any of the other witnesses, but merely corroborated what was essentially an undisputed fact, that a gun had been discharged nearby that night,[15] there is no reasonable possibility that they influenced the jury's verdict. For largely the same reasons, the disputed statements were not unfairly prejudicial to appellant. Thus, even if the statements in the CAD report were inadmissible, any error in admitting them was harmless.

> **JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

---

[15] The victim's appearance at the firehouse, in a car whose lights were on and whose engine was running, near death and with a gunshot wound to his temple, was indisputable evidence that a gun had been discharged nearby that evening, just a few minutes earlier.